No. 75,684

STATE OF KANSAS, *Appellee,* v. CLIFFORD A. SCOTT, *Appellant.*
(961 P.2d 667)

Opinion filed May 29, 1998.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the supplemental and reply briefs for appellant; *Edward G. Collister, Jr.,* special appellate defender, was on the brief for appellant.

*Carla J. Stovall,* attorney general, argued the cause, and *Nancy Siples Brumbeloe,* assistant district attorney, and *Joan M. Hamilton,* district attorney, were with her on the brief for appellee; *Kelli L. Newton,* assistant attorney general, was on the supplemental brief for appellee.

**2**

*Kelly A. Feyh*, assistant attorney general, was on the brief for *amicus curiae* Carla J. Stovall, attorney general.

The opinion of the court was delivered by

LARSON, J.: This first impression case in Kansas reviews a decision by the Court of Appeals, *State v. Scott*, 24 Kan. App. 2d 480, 947 P.2d 466 (1997), holding the public access provisions of the Kansas Sex Offender Registration Act (KSORA), K.S.A. 22-4901 *et seq.*, constitute cruel and unusual punishment. Clifford Allen Scott was convicted of attempted aggravated sexual battery and placed on probation. Scott appealed the trial court's order that he register pursuant to the provisions of the KSORA. The Court of Appeals determined that in Scott's case the public access provisions of the KSORA were cruel and unusual and ordered that his registration should not be open to inspection by the public or subject to the Kansas Open Records Act, K.S.A. 45-215 *et seq.*

*Factual statement*

In July 1995, Scott brought alcohol to the apartment of a former co-employee (J.R.). The two drank and watched T.V. for awhile, until J.R. went to her room to go to bed, leaving Scott to sleep on the sofa. J.R. awoke to find Scott in her room asking to have sex with her and attempting to fondle her.

J.R. repeatedly told Scott not to touch her and that she did not want to have sex with him. Scott persisted and attempted to remove J.R.'s nightclothes. When J.R. resisted Scott's advances, he dragged her from her room and started beating, kicking, and stomping her.

The police were notified. The two officers dispatched to J.R.'s apartment found her with a bloody nose and dressed in a robe spotted with blood. J.R. stated Scott had hit her, fondled her, and requested sex. J.R. went to an emergency room where she was diagnosed with numerous fractured ribs. J.R. also suffered bruises and pain to her face, arms, and legs.

Scott was charged with aggravated sexual battery, K.S.A. 21-3518(a)(1), a severity level 5, person felony, and aggravated battery, K.S.A. 21-3414(a)(1)(C), a severity level 7, person felony. J.R. appeared in court and testified regarding Scott's attack.

Scott ultimately entered into a plea agreement whereby he pled no contest to an amended count of attempted aggravated sexual battery, K.S.A. 21-3301 and K.S.A. 21-3518(a)(1), a severity level 7, person felony. The State dismissed the aggravated battery charge. Before accepting Scott's plea, the court informed him he would be required to register as a sex offender. Scott acknowledged he understood this.

At the sentencing hearing, J.R. made the following statement:

"I am addressing this plea to the Shawnee County Courthouse . . . to let you know that I'm not at all happy or satisfied with the case, the way it has been handled. The case against Scott Clifford, the defendant, has not been handled with more interest and more seriousness toward me. I'm still suffering because of the injury I received from the crime that Scott Clifford inflicted on me. I lost wages, lost my confidence to trust anyone. I lost—excuse me.

"THE COURT: Go ahead.

"[J.R.]: I can't read it.

"THE COURT: Okay. Counsel, do you want to just read that into the record?

"MS. BRUMBELOE: She says, '. . . lost peace of mind. I wake up during the night with a cold sweat and have a hard time going back to sleep. I wake up during the night with the nightmare feeling that someone is standing beside my bed. Scott Clifford came to my bedroom, started putting his filthy hand on me and tried to force himself on me and tried to have sex with me and when I tried to tell him no, he started attacking me in a brutal way. This man turned on me like a wild animal, and after what he did to me, he tried to say he doesn't remember anything and he is sorry. Well, sorry doesn't work for me. What happened to me is real and painful. I would like him to pay to the maximum of time and to go in prison so he will not hurt any woman or anybody. This type of crime against any women or children will not be tolerated anymore, and I would like the system to make a serious commitment to take steps for a better future and to punish the criminal to the fullest of time. Thank you."

Scott was sentenced to 14 months in the custody of the Secretary of Corrections. Yet, because he fell within presumptive probation, he was placed on probation for 24 months. The court indicated the legislature had severely limited the court's discretion to make a different sentence, stated it sympathized with J.R.'s request for Scott's imprisonment, and declared Scott's probation would be rigorously supervised. Despite Scott's constitutional objections, the court ordered him to register as a sex offender under the KSORA.

Scott appealed the order for his registration as a sex offender under the KSORA, alleging the public disclosure provisions were unconstitutional. Scott's arguments on appeal included only his contentions that the registration and disclosure requirement constituted double jeopardy and cruel and unusual punishment. Scott has failed to make any record concerning the effect registration and the public disclosure has had upon him, and we are limited to the record before us.

The Court of Appeals rejected Scott's double jeopardy argument but decided the public access element of the KSORA violated the prohibition against cruel or unusual punishment in § 9 of the Kansas Constitution Bill of Rights.

We granted the State's petition for review. Scott did not request review of the Court of Appeal's determination that the registration provision did not violate the prohibition against double jeopardy. Therefore, our analysis is limited to the single issue of whether the KSORA violates the constitutional restrictions prohibiting cruel and unusual punishment. We hold it does not.

*Analysis*

The constitutionality of a statute is a question of law, over which we exercise an unlimited standard of review. *State v. Myers,* 260 Kan. 669, 676, 923 P.2d 1024 (1996). When reviewing the constitutionality of a statute, we must keep in mind the following:

"The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt." *State v. Bryan,* 259 Kan. 143, Syl. ¶ 1, 910 P.2d 212 (1996).

Scott has asserted that the KSORA constitutes cruel or unusual punishment as applied to him. K.S.A. 22-4904 of the KSORA provides:

"(a) Within 15 days of the sex offender coming into any county in which the sex offender resides or is temporarily domiciled for more than 15 days, the sex offender shall register with the sheriff of the county."

K.S.A. 22-4907 requires that the registration include the offender's name, date of birth, offense or offenses committed, date of conviction or convictions, places of conviction, photograph, fingerprints, and social security number. The provisions critical for this appeal are those permitting public access of the registration information, which are set forth in K.S.A. 22-4909 as follows:

"The statements or any other information required by this act shall be open to inspection in the sheriff's office by the public and specifically are subject to the provisions of the Kansas open records act, K.S.A. 45-215 *et seq.*, and amendments thereto."

The Eighth Amendment to the United States Constitution, applicable to the states pursuant to the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Section 9 of the Kansas Constitution Bill of Rights declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

Although discussing the prohibition against cruel and unusual punishments in the United States Constitution, the Court of Appeals only specifically held that the public disclosure provisions of the KSORA violated § 9 of the Kansas Constitution Bill of Rights. We will, however, decide whether the KSORA violates the cruel and unusual punishment provisions of both the Kansas and the United States Constitutions.

Although we have the right to interpret our Kansas Constitution in a manner different than the United States Constitution has been construed, *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993), we have not traditionally done so. See *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996). The wording of both clauses at issue is nearly identical, and we will look to constructions of both provisions in reaching our conclusions herein.

Although similar laws in other states have not been held to be punitive in nature, we expressly held in *State v. Myers*, 260 Kan. at 699, that despite the lack of punitive purpose on the part of the legislature in enacting the KSORA, the repercussions under the Act due to the public access provisions are great enough to be

considered punishment for purposes of an ex post facto analysis. We are not here faced with an ex post facto situation, and logical arguments could be made to support a different result in this case if Scott like Myers had committed his crime before the enactment of the KSORA. However, we will not attempt to alter the *Myers* conclusion as to the punitive effect of the KSORA. With this threshold requirement established, we now must decide whether the punitive nature of the public access provisions of the KSORA amounts to cruel or unusual punishment.

In *State v. Coutcher,* 198 Kan. 282, 288, 424 P.2d 865 (1967), we quoted *Weems v. United States,* 217 U.S. 349, 368, 54 L. Ed. 793, 30 S. Ct. 544 (1910): " 'What constitutes a cruel and unusual punishment has not been exactly decided. It has been said that ordinarily the terms imply something inhuman and barbarous, torture and the like.' " In *State v. Freeman,* 223 Kan. 362, 367, 574 P.2d 950 (1978), we said: "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."

Chief Justice Warren, speaking for the United States Supreme Court, addressed the nature of cruel and unusual punishment in *Trop v. Dulles,* 356 U.S. 86, 99-101, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958):

"The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness

and unusual in its character. [Citing *Weems*, 217 U.S. 349.] The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

In deciding the KSORA constituted cruel or unusual punishment, the Court of Appeals gave consideration to whether the public access provisions inflicted injury to the reputational interests of an offender. The court stated these reputational interests were identified in *E.B. v. Verniero*, 119 F.3d 1077, 1102 (3d Cir. 1997), and defined as

" 'the burdens of isolation, harassment, loss of opportunities, and the myriad of more subtle ways in which one is treated differently by virtue of being known as a potentially dangerous sex offender. The other type of indirect effect is exposure to an increased risk of private violence that can result in damage to one's property or injury to one's person.' " 24 Kan. at 484.

Although reputational interests were identified in *Verniero*, they were not considered sufficient to even make New Jersey's Megan's Law punitive. Each was discussed and rejected. The *Verniero* opinion ruled:

" '[Defendant's] claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be 'private' but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.' [Quoting *Paul v. Davis*, 424 U.S. 693, 713, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976).]

"[N]either does New Jersey's publication (through notification) of registrants' convictions and findings of dangerousness implicate any interest of fundamental constitutional magnitude." 119 F.3d at 1103.

The fact a punishment may injure the reputational interests of an offender does not thereby render the punishment cruel or unusual and is not by itself an element to be considered when deciding whether the punishment is unconstitutional. Rather, we consider whether the method and effect of the punishment is itself inhumane, inherently cruel, shocking, unacceptable, or offends human dignity. The Court of Appeals erroneously included injury to reputational interests among the tests for declaring a punitive statute cruel or unusual. Although not argued by the parties, we note

that K.S.A. 21-4006 makes malicious exposing of a paroled or discharged person a class B nonperson misdemeanor.

The Court of Appeals next applied the three-prong test set forth in *Freeman*, 223 Kan. at 367, designed to determine whether the length of a sentence constitutes cruel or unusual punishment, to the facts of the present case. The applicability of the *Freeman* test to Scott's case, however, is tenuous. No Kansas case has applied this test in circumstances where the length or consecutive nature of sentences were not at issue. In fact, in *State v. Scherzer*, 254 Kan. 926, 939, 869 P.2d 729 (1994), where the place of confinement required by K.S.A. 1992 Supp. 21-3405b was claimed to be unconstitutional by comparison with the punishments imposed for more serious offenses, we rejected the contention and said:

"The concern addressed in *Freeman* is disparity in the length of the sentence, not the place of serving the sentence. Cruel and unusual punishment involves punishment that shocks the conscience or 'which seems inhumane or barbarous.' The legislature is the branch of government entrusted with the power to set the punishment for a crime. *State v. Reed*, 248 Kan. 792, 798, 811 P.2d 1163 (1991). The fact the legislature chose to allow house arrest for aggravated vehicular homicide offenders, and not for vehicular battery offenders, does not rise to the level of cruel and unusual punishment."

By this holding we appear to have distanced ourself from, if not outright rejected, the application of the *Freeman* test when the length of a sentence was not being challenged.

The *Freeman* test was based upon the factors set forth by the United States Supreme Court in *Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983). The proportionality test, one of the factors applied in *Solem*, however, was discredited by a majority of the United States Supreme Court in *Harmelin v. Michigan*, 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680 (1991). Although only two members advocated outright abandonment of the test, three concurring Justices, Justice Kennedy, joined by Justice O'Connor and Justice Souter, concluded:

"This Court's decisions recognize that the Eighth Amendment's Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle that applies to noncaptial sentences. See, *e.g., Weems v. United States*, 217 U.S. 349, 371; *Rummel v. Estelle*, 445 U.S. 263, 271-274, and n. 11; *Hutto v. Davis*, 454 U.S. 370, 374, and n. 3; *Solem v. Helm*, 463 U.S. 277. Although these decisions

have not been totally clear or consistent, close analysis yields some common principles that give content to the uses and limits of proportionality review. First, the fixing of prison terms for specific crimes involves a substantial penological judgment that, as a general matter, is properly within the province of the legislature, and reviewing courts should grant substantial deference to legislative determinations. Second, there are a variety of legitimate penological schemes based on theories of retribution, deterrence, incapacitation, and rehabilitation, and the Eighth Amendment does not mandate adoption of any one such scheme. Third, marked divergences both in sentencing theories and the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure, and differing attitudes and perceptions of local conditions may yield different, yet rational, conclusions regarding the appropriate length of terms for particular crimes. Fourth, proportionality review by federal courts should be informed by objective factors to the maximum extent possible, and the relative lack of objective standards concerning length, as opposed to type, of sentence has resulted in few successful proportionality challenges outside the capital punishment context. Finally, the Eighth Amendment does not require strict proportionality between crime and sentence, but rather forbids only extreme sentences that are grossly disproportionate to the crime." 501 U.S. at 959.

While there may still be instances where the *Freeman* test should be applied, we will not apply it precisely here where the method of punishment, rather than the length of a sentence, is challenged as cruel or unusual. Neither this court nor the Supreme Court has applied such test outside of the length of sentence context. See, *e.g., Trop,* 356 U.S. 86. We may look to some of the *Freeman* factors in our analysis, but our basic question is whether the public access provisions of the KSORA render punishment so barbarous and contrary to human dignity that it shocks our conscience.

Scott committed a very violent crime after an acquaintance refused to have sex with him. He claims not to even remember his actions. The trial court clearly desired to impose a prison term, but Scott's criminal history score designated the presumptive probation section of the guidelines grid. The fact that for some criminals the crime which Scott committed will result in probation should not detract from the legislative decision that sex offenders who are permitted to remain at large in society should be required to register in order to better protect the public.

Furthermore, the legislature has reached the conclusion that sex offenders in general pose a greater risk of reoffending such that

the public should have the opportunity to defend themselves from this danger. Although there may be cases where the degree of danger seems so minimal that imposition of the public disclosure provisions would seem unduly harsh, the facts of the present case do not clearly support this conclusion. It is not for this court to overrule the legislative determination of the danger posed by sex offenders, particularly where the record, as in this case, does not warrant a finding that the offender poses no danger to society.

In determining whether the statute is cruel or unusual, we also consider the lack of penological purpose in the KSORA. In *Myers,* we clearly found there simply was no legislative purpose or intent to ex post factually punish sex offenders under the KSORA. 260 Kan. at 681. We deemed the statute unconstitutional as applied to offenses which occurred prior to the enactment of the KSORA because "[t]he unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety." 260 Kan. at 699. We must remember, however, that the burden imposed by a statute which operates retroactively so as to violate the prohibition against ex post facto laws may be much less pronounced than the onerous nature of a burden which would be imposed by a cruel or unusual punishment.

While it is troublesome that there is no differentiation in Kansas among the registration and public access provisions for various sex offenses, this, in and of itself, does not require a finding that the KSORA constitutes cruel and unusual punishment. We stated in *Myers:*

"Public access to sex offender registration is a matter of legislative public policy. Although we defer to the legislature on policy matters, we must, however, exercise our duty of analysis when ex post facto claims impact legislative policy. Would-be sex offenders have been on notice since April 14, 1994, when KSORA became law, that if they commit certain crimes they will be subject to public disclosure under K.S.A. 22-4909." 260 Kan. at 700.

Here, Scott was specifically informed before he entered his plea that he would be required to register under the KSORA. This is clearly different from *Myers.*

It is clearly the legislature's role to specify punishment. *State v. Reed,* 248 Kan. 792, 798, 811 P.2d 1163 (1991). The legislature

also has the right to determine that sex offenders pose a unique threat to society such that they are subject to registration and public disclosure requirements when other types of offenders are not. The legislature need not extend such requirements to all classes of offenders which may pose some danger to society. See *In re Care & Treatment of Hay*, 263 Kan. 822, 833, 953 P.2d 666 (1998).

In reaching our conclusion that the KSORA does not inflict cruel or unusual punishment upon offenders, we have examined the recently amended sex offender registration acts of our sister states. In order to comply with the requirements of 42 U.S.C. § 14071 (1994), most states amended their registration laws in 1997 and now provide for much greater public access than existed when we decided *State v. Myers* over 2 years ago. Many other states now allow broad public access to sex offender registration information similar to that permitted in Kansas. See, *e.g.*, Alaska Stat. § 12.63.010 *et seq.* (1996); Colo. Rev. Stat. § 18-3-412.5 (1997 Supp.); Fla. Stat. § 944.606 (1997); Hawaii Rev. Stat. § 846E-1 *et seq.* (1997 Supp.); Iowa Code § 692A.1 *et seq.* (1998 Supp.); Mass. Gen. L. ch. 6, § 178C *et seq.* (1996); Mich. Comp. Laws Ann. § 28.721 *et seq.* (West 1998 Supp.); N.D. Cent. Code § 12.1-32-15 (1997); Tenn. Code Ann. § 40-39-101 *et seq.* (1997). Virtually every state now permits some public access, and all require sex offenders to register.

Furthermore, our research has revealed no cases which have found that public notification laws constitute cruel or unusual punishment, although several courts have considered the issue. See, *e.g., Alan A. v. Verniero*, 970 F. Supp. 1153 (D.N.J. 1997); *Doe v. Kelley*, 961 F. Supp. 1105 (W.D. Mich. 1997); *John Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995).

Statements from various courts considering the punitive nature of public access and disclosure laws support the conclusion that the KSORA does not amount to cruel or unusual punishment. In *John Doe v. Poritz*, the New Jersey Supreme Court held its disclosure statute to be constitutional and noted:

"To rule otherwise is to find that society is unable to protect itself from sexual predators by adopting the simple remedy of informing the public of their presence. That the remedy has a potentially severe effect arises from no fault of

government, or of society, but rather from the nature of the remedy and the problem; it is an unavoidable consequence of the compelling necessity to design a remedy.

. . . .

"We are satisfied that this statute, rationally and carefully addressed to a pressing societal problem, is not what those who drafted the Constitution had in mind as an abuse of government's power to punish. What government faced here was a difficult problem, a question of policy, and it understandably decided that public safety was more important than the potential for unfair, and even severe, impact on those who had previously committed sex offenses." 142 N.J. at 109-10.

In *Russell v. Gregoire,* 124 F.3d 1079, 1091-92 (9th Cir. 1997), the 9th Circuit addressed allegations that the public disclosure provisions equated to historic shaming punishments:

"Although historical punishments did notify the community and humiliate the offender, an adequate historical analysis is not that simple. . . . History does not tell us whether this sort of notification ought to be regarded as punishment. At best, we can draw an analogy between the Act and the punishments of yesteryear. That analogy is not unassailable, however. Historical shaming punishments like whipping, pillory, and branding generally required the physical participation of the offender, and typically required a direct confrontation between the offender and members of the public. As the Third Circuit recently stated: 'Public shaming, humiliation and banishment all involve more than the dissemination of information. . . . [T]hese colonial practices inflicted punishment because they either physically held the person up before his or her fellow citizens for shaming or physically removed him or her from the community.' *E.B. v. Verniero,* 119 F.3d 1077, 1099-1100 (3d Cir. 1997). Put another way, 'the potential ostracism and opprobrium that may result from [notification] is not inevitable, as it was with the person whipped, pilloried or branded in public.' *Poritz,* 931 F. Supp. at 1217. More importantly, the Washington law is not intended to be punitive—it has protective purposes—while shaming punishments 'were intended to and did visit society's wrath directly upon the offender.' *Id.*

"Other historical analogies are also instructive. It is at least as appropriate to compare the notification law to 'wanted' posters and warnings about escaped prisoners or other dangerous persons—practices that have not been regarded as punishment, though they disclose essentially the same information, may rouse public excitement, and may carry a greater risk of vigilantism.

"This discussion reveals the perils of using historical parallels to determine whether a sanction is punishment. True, punishment in the past often relied on humiliation. But humiliation alone does not constitute punishment. A law imposing punishment has other ingredients—most importantly, an intent to punish. See [*United States v. Ursery,* 518 U.S. 267, 135 L. Ed. 2d 549, 116 S.Ct. 2135 (1996)]."

Although the 9th Circuit held the Washington statute to be non-punitive in part because the disclosure provisions were narrowly limited, the court did recognize that "[t]he information collected and disseminated by the Washington statute is already fully available to the public and is not constitutionally protected." *Russell v. Gregoire,* 124 F.3d at 1094.

The court in *Alan A. v. Verniero,* stated:

"The humiliation and shame felt by the offender originates in the underlying crimes committed, not in the notification procedure or in the reaction of the public to such conduct. See *Doe v. Kelley,* 961 F. Supp. 1105, 1110 (W.D. Mich. 1997) ("Unlike historical uses of branding, shaming and banishment, the notification provisions do not affirmatively impose any suffering, restraint or obligation on the offender"). Although ostracism may be a possible consequence of notification, that is not the intended purpose of Megan's Law. It is simply result-oriented sophistry to argue the Act was designed or implemented to promote ostracism. If ostracism occurs, it is the direct, foreseeable result of the abhorrent conduct of an offender.

"As well, there are numerous 'critical, dispositive differences' between community notification and the 'public shaming' punishments of the colonial era. [Citation omitted.] Unlike Megan's Law, the historical punishment of public shaming lacked a remedial purpose and served solely to punish an individual through degradation. Historic shaming punishment was widespread as notification was made to the whole of society. Megan's Law, in contrast, is tailored to limit notification, if it occurs at all, to protect those most vulnerable and 'likely to encounter the offender.' [Citation omitted.] Finally, the effects of the historical shaming punishment were inevitable as they were 'an integral part of the sentence.' [Citation omitted.] The repercussions of Megan's Law, however, are indirect consequences not part of the Act itself. 'Megan's Law is not a lust for retribution; it is a measured attempt to achieve remedial with attendant deterrent goals.' *[W.P. v. Poritz,* 931 F. Supp. 1199, 1217 (D.N.J. 1996).] Although violence against an offender is not tolerable, the offender should not, and cannot, expect community approval." 970 F. Supp. at 1175.

The *Alan A.* court also declared:

"Megan's Law is a remedial measure designed to protect society, not to brand or banish. The notification that occurs is calibrated to the offender's risk of re-offense through a series of procedures. Any stigma associated with having a criminal record, comes from the commission of the crime itself, not from the notification imposed through the Act." 970 F. Supp. at 1193.

Although numerous law review articles have been examined, few contain much comment regarding whether such public notification

acts constitute cruel or unusual punishment. Somewhat helpful is Comment, *California's Sex Offender Notification Statute: A Constitutional Analysis,* 33 San Diego L. Rev. 1195, 1216-21 (1996), which concludes that a California court is unlikely to invalidate California's notification statute on grounds of cruel and unusual punishment, after recognizing the legislative prerogative, questioning the disproportionality as applied only to sex offenders, and noting that enactment of numerous notification statutes may constitute an "evolving standard."

Simeon Schopf, *"Megan's Law": Community Notification and the Constitution,* 29 Columbia Journal of Law and Social Problems 117, 131-33 (1995), writes:

"[T]he purpose of 'Megan's Law' is to facilitate the protection of the community and its children. . . . The goal of the law is not to make life miserable for the released offender, but to protect the vulnerable from those most likely to commit violent crimes. Given the standard established by the Supreme Court in *Trop v. Dulles,* [356 U.S. 86], 'Megan's Law' would not be considered penal in its nature. Community notification was enacted, 'not to punish, but to accomplish some other legitimate governmental purpose.' . . .

"Even assuming that a court found the community notification provision to be a punishment, it would not violate the Eighth Amendment unless it were deemed 'cruel and unusual.' . . .

"It could be argued that the stigma associated with public notification places it in the category of excessive punishment. However, the Supreme Court's decision in *Harmelin v. Michigan,* [501 U.S. 957 (1991)] suggests that this argument is not likely to succeed. 'The *Harmelin* plurality recognized that reviewing courts should grant substantial deference to the authority of legislatures to determine the proper types and limits of punishments for crimes. Furthermore, the Court noted that the Eighth Amendment does not mandate strict proportionality between crime and sentence but rather "forbids extreme sentences that are grossly disproportionate to the crime." A statute providing for the release of information regarding only the most dangerous criminals promotes the important purpose of notifying the public of their presence while still protecting the privacy of those willing to undergo treatment.' " (Quoting Note, *Sex Offender Registration Acts: An Added Dimension to the War on Crime,* 28 Ga. L. Rev. 729, 756 [1994].)

In light of the foregoing and despite the availability of Scott's registration information imposed by the KSORA, we hold the legislature did not inflict a cruel or unusual punishment upon Scott by permitting public access to his registration information. The legislature has determined it is necessary for public safety to allow

the public access to this collected information. Additionally, offenders have been placed on notice that they would be subject to the public disclosure provisions of the KSORA. Due to the nonpunitive intent and the concern for public safety in the KSORA, as well as the legislature's prerogative to set punishment for criminals, we do not see the public access provisions as so inhumane as to constitute cruel or unusual punishment, particularly where the allegedly injurious consequences of such access are due solely to the offenders' own criminal conduct.

In his supplemental brief to this court, Scott attempts to raise for the first time questions as to whether 1997 amendments to the KSORA should apply to him and whether the absence of any mechanism for individualized preregistration or prenotification risk assessment implicates due process and privacy concerns. We make no comment on these issues and adhere to our rule that when constitutional grounds are asserted for the first time on appeal, they are not properly before us. *State v. Myers*, 260 Kan. at 701; *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993). Our holding is limited to whether the registration and public access provisions of the KSORA constitute cruel or unusual punishment as to Scott under the Eighth Amendment to the United States Constitution or § 9 of the Kansas Constitution Bill of Rights.

Under the facts of this case, the punitive effect of the registration and notification provisions of the KSORA resulting from an interest in public safety are not so disproportionate to Scott's violent, sexually motivated crime that such registration and public access is deemed inhumane, shocking, barbarous, or contrary to fundamental notions of human dignity so as to constitute cruel and unusual punishment.

The Court of Appeals is affirmed as to its decision that the KSORA does not constitute double jeopardy. The Court of Appeals is reversed in its decision that the KSORA constitutes cruel or unusual punishment in violation of the United States and Kansas Constitutions. The district court is affirmed.