(70 P.3d 1217)

No. 87,137

WILLIAM E. VAN DYKE, *Appellant*, v. STATE OF KANSAS, *Appellee*.

Opinion filed June 20, 2003.

*James E. Rumsey,* of Lawrence, for appellant.

*Angela M. Wilson,* assistant district attorney, *Christine E. Kenney,* district attorney, and *Carla J. Stovall,* attorney general, for appellee.

Before BEIER, P.J., ELLIOTT and GREEN, JJ.

BEIER, J.: William Van Dyke appeals the denial of his K.S.A. 60-1507 motion, claiming that his presumptive 55-month sentence for attempted rape constitutes cruel and unusual punishment.

Van Dyke is 79 years old. He entered into a plea bargain in which the State agreed to drop charges of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child in exchange for a plea to one count of attempted rape of his 10-year-old granddaughter, who has cerebral palsy. Van Dyke was informed that a

severity level 3 person felony and a criminal history of "I" carried a presumptive prison term of 55 months to 61 months in prison and that he could receive a sentence as long as 247 months. Van Dyke moved for a downward dispositional departure.

At the departure hearing, clinical psychologist Robert Schulman testified that he began evaluating Van Dyke in October 1999. He concluded that Van Dyke was not a pedophile and was not a danger to society or other children. He further opined that Van Dyke's wife's participation in therapy was critical to its success and, if Van Dyke went to prison, that the impact of his depression and his physical problems would cause him to lose his will to live.

Van Dyke's wife and three of his adult children testified that Van Dyke was very dependent on his wife and very depressed. They all expressed concern for his emotional and physical health and believed that he would give up the will to live if sent to prison. Van Dyke stated that he suffered from numerous medical problems, including heart, prostate, kidney, and back conditions.

The district court denied the motion to depart, stating:

"This is a crime against an individual who had a very close relationship with the defendant and the individual of course by the plea was found to be youth of a child victim and there is evidence that incarceration in this case would be health endangering to the defendant and to be honest, that's what I wrestled most with in the matter but I've had to balance this case and give recognition for the crime that is committed by Mr. Van Dyke, the relationship you had and it is that the type of sentencing that hopefully would have other individuals who find themselves in a similar position as you a deterrent.

"Again this is a difficult matter because of your age, because of your health, because of the dependency of your wife; but due to the nature of the crime, due to the relationship of the victim and, of course, her afflictions as well, cerebral palsy, this court believes that the issue here goes beyond vindictiveness. The court is sincerely aware that the programs in the prison system albeit, of course not somebody with the qualification that Dr. Schulman would provide would still hopefully provide some type of treatment and rehabilitative effort for you."

Van Dyke is now housed at the Hutchinson Correctional Facility.

Van Dyke filed the instant K.S.A. 60-1507 motion, alleging the district court's refusal to grant a downward dispositional departure and the requirement that he serve his sentence in the custody of

the Secretary of Corrections constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights.

According to the parties' agreed statement of facts, Schulman visited Van Dyke on four occasions while Van Dyke was still housed at the Douglas County Jail. Van Dyke's wife was present at three of the meetings. Over this period of time, Van Dyke deteriorated psychologically, becoming more depressed and anxious. According to Schulman, the effect of Van Dyke's separation from his wife created a downward trend in his functioning and in his ability to be treated; he was having difficulty beyond that expected during a normal adjustment to prison. Although depression had been a driving force behind the sexual abuse, Van Dyke's depression had progressed to an "immobilizing" level such that he would not be a threat to others if released to an outpatient program.

Van Dyke's wife observed that her husband had become deeply depressed; his hands shook; he had greatly reduced mobility of his shoulder joint; his voice was shaky; and he had lost weight because he was rushed at mealtime. She described him as horribly guilt ridden and sorry, sad all of the time, and mixed up and confused. She was concerned that the psychological effects of the incarceration would cause him to shut down and eventually die.

At oral argument on the motion, Van Dyke's counsel articulated three reasons why Van Dyke's sentence was cruel and unusual: (1) the length of the sentence; (2) the gross disproportionality of the sentence; and (3) Van Dyke's need for medical or psychological treatment that could not be provided while he was in the custody of the Secretary of Corrections. Van Dyke's counsel also argued that the sentence was cruel and unusual as applied to his client because the evidence showed that Van Dyke would die if sent to prison. Specifically, he argued that uncontroverted evidence showed Van Dyke's condition would deteriorate if his wife were not permitted to be involved in his treatment and that she could not be involved while he was housed in prison at Hutchinson.

The district court denied the 60-1507 motion, finding Van Dyke had "failed to prove by a preponderance of the evidence that the

sentence was indeed cruel and unusual under any of the arguments."

In his appellate briefs, Van Dyke argues that his sentence violates the Eighth Amendment and § 9 of the Kansas Constitution Bill of Rights in two aspects: its length and its mode of service. At oral argument, Van Dyke's counsel also indicated that his client challenged the absence of effective medical and psychological treatment at Hutchinson Correctional Facility as a deliberate indifference to his health problems, a third type of cruel and unusual punishment claim. We address each argument in turn.

### Length/Proportionality

Our most recent guidance on how to evaluate a claim that a term of years is disproportionate and, therefore, cruel and unusual punishment under the Eighth Amendment came in two United States Supreme Court cases decided this term. In each, the Court reviewed sentences involving California's "three strikes" law. See *Ewing v. California*, 538 U.S. 11, 155 L. Ed. 2d 108, 123 S. Ct. 1179 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 155 L. Ed. 2d 144, 123 S. Ct. 1166 (2003). These decisions were announced after oral argument on this appeal, and neither party has filed a notice of supplemental authority under Supreme Court Rule 6.09 (2002 Kan Ct. R. Annot. 41) or otherwise sought to assist us with interpretation of the Supreme Court's language.

In *Ewing*, the defendant walked out of a golf course pro shop with three golf clubs worth a total of $1,200 hidden in his pant leg. Ewing had a lengthy record of theft, drug, burglary, and robbery convictions and was on parole when he stole the golf clubs. The robbery and three burglary convictions qualified as prior serious or violent felonies under the California sentencing scheme, and Ewing received a sentence of 25 years to life.

The Supreme Court ultimately upheld the sentence, rejecting Ewing's claim that it was grossly disproportionate under the Eighth Amendment. Justice O'Connor, speaking for herself, Chief Justice Rehnquist, and Justice Kennedy, reviewed earlier decisions in four proportionality cases: *Harmelin v. Michigan*, 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680 (1991); *Solem v. Helm*, 463 U.S. 277,

77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983); *Hutto v. Davis*, 454 U.S. 370, 70 L. Ed. 2d 556, 102 S. Ct. 703 (1982); and *Rummel v. Estelle*, 445 U.S. 263, 63 L. Ed. 2d 382, 100 S. Ct. 1133 (1980). In only one of the four, *Solem*, had the Court concluded the Eighth Amendment prohibited the sentence under consideration. The defendant in that case had received a life sentence without possibility of parole for a seventh nonviolent felony.

In *Harmelin*, the defendant was not a recidivist; as a first-time offender, he had received life in prison without possibility of parole for possession of 672 grams of cocaine. Still, as Justice O'Connor observed in *Ewing*, "[a] majority of the Court rejected Harmelin's claim that his sentence was so grossly disproportionate that it violated the Eighth Amendment. The Court, however, could not agree on why his proportionality argument failed." 538 U.S. at 23. Justice Scalia, joined by Chief Justice Rehnquist, concluded the proportionality principle was limited to death penalty cases, "rather than a generalizable aspect of Eighth Amendment law." *Harmelin*, 501 U.S. at 994. On the other hand, Justice Kennedy and two other members of the Court would have recognized the proportionality principle in noncapital cases. Justice Kennedy set forth four principles to be considered in a proportionality review: "the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"; these four principles, in turn, "inform" a fifth and final one: "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in the judgment) (citing *Solem*, 463 U.S. at 288, 303).

In the *Ewing* decision, Justice O'Connor chose to rely upon Justice Kennedy's five *Harmelin* principles. Addressing the first three, she said recidivist statutes such as California's three strikes law, demonstrated a

"deliberate policy choice that individuals who have repeatedly engaged in serious or violent criminal behavior, and whose conduct has not been deterred by more conventional approaches to punishment, must be isolated from society in order

to protect the public safety. Though three strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important policy decisions is longstanding. [Citations omitted.]

"Our traditional deference to legislative policy choices finds a corollary in the principle that the Constitution 'does not mandate adoption of any one penological theory.' [Citation omitted.] A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation. [Citation omitted.] Some or all of these justifications may play a role in a State's sentencing scheme. Selecting the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts." *Ewing*, 538 U.S. at 24-25.

Justice O'Connor then engaged in an extended discussion of the gravity of Ewing's offense in comparison to his sentence. She noted that his crime was considerably more serious than his choice of description — "shoplifting three golf clubs" — indicated. Ewing had been convicted of theft of property worth $1,200, an amount that placed him in felony territory in the federal system and most state systems. In addition, the weighing of his offense was colored by his long history of felony recidivism, which could not be ignored, lest the Court "fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions." *Ewing*, 538 U.S. at 29.

Thus, according to Justice O'Connor's opinion in *Ewing*, a proportionality analysis has both on-its-face and as-applied elements:

"To give full effect to the State's choice of this legitimate penological goal, our proportionality review of Ewing's sentence must take that goal into account.

"Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record. . . . To be sure, Ewing's sentence is a long one. But it reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated. . . . Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' " *Ewing*, 538 U.S. at 29-30. (quoting *Harmelin*, 501 U.S. at 1005) (Kennedy, J., concurring in part and concurring in judgment).

Justice Scalia and Justice Thomas concurred in the judgment in *Ewing* but disagreed with the reasoning of Justice O'Connor's opinion. Justice Scalia protested that he could not "intelligently apply" the proportionality analysis set forth. "Proportionality," he

wrote, "— the notion that punishment should fit the crime — is inherently a concept tied to the penological goal of retribution. '[I]t becomes difficult even to speak intelligently of "proportionality," once deterrence and rehabilitation are given significant weight,' [citation omitted] — not to mention giving weight to the purpose of California's three strikes law: incapacitation." *Ewing*, 538 U.S. at 31 (Scalia, J., concurring in judgment) (quoting *Harmelin*, 501 U.S. at 989). Justice Thomas' separate opinion stated simply that, in his view, the Eighth Amendment cruel and unusual punishment doctrine included no proportionality principle. 538 U.S. at 32. (Thomas, J., concurring in judgment).

The second United States Supreme Court case from this term, *Lockyer*, involved crimes even less serious than those at issue in *Ewing*. The defendant, Leandro Andrade, received two consecutive terms of 25 years to life for convictions under California's three strikes law stemming from thefts of videotapes from two different K-Mart stores. The total value of the videotapes was approximately $150. Andrade had been in and out of state and federal prison for many years for drug, theft, and burglary offenses, and he had admitted he stole to support a drug addiction. The thefts of the videotapes were charged as felonies because of Andrade's previous convictions. At sentencing, it was his previous burglary convictions that led specifically to application of the three strikes law to both of his new felony convictions.

The Ninth Circuit Court of Appeals eventually granted Andrade's habeas corpus petition, finding that the California courts had committed clear error by disregarding *Solem*. According to the Ninth Circuit, this constituted an "unreasonable application of clearly established Supreme Court law," as required for federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 (2000). See *Lockyer*, 538 U.S. at 69-70 (quoting *Andrade v. Attorney General of State of California*, 270 F.3d 743, 766 [9th Cir. 2002]).

Justice O'Connor, writing for a five-member *Lockyer* majority, reversed the Ninth Circuit decision. She first observed that the task of determining whether there was clearly established law at the time of a state court decision is usually "straightforward"; how-

ever, in the case of Eighth Amendment disproportionality analysis, Supreme Court precedents "have not been a model of clarity." 538 U.S. at 72. One synthesized holding, she wrote, has emerged: "A gross disproportionality principle is applicable to sentences for terms of years." *Lockyer*, 538 U.S. at 72.

The question then becomes "what factors may indicate gross disproportionality." Justice O'Connor concluded: "[T]he only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework [of the AEDPA] is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Lockyer*, 538 U.S. at 73 (citing *Harmelin*, 501 U.S. at 1001) (Kennedy, J., concurring in part and concurring in judgment).

The majority then determined that the facts of Andrade's case were materially distinguishable from those in *Solem* and did not amount to a constitutional violation reserved for "only the extraordinary case"; thus, the California courts had neither acted "contrary to" nor "unreasonably applied" the gross disproportionality principle. *Lockyer*, 538 U.S. at 73-77. The Ninth Circuit was reversed, and Andrade's sentences upheld. *Lockyer*, 538 U.S. at 77.

Justice Souter wrote for the four dissenting justices in *Lockyer* — himself and Justices Stevens, Ginsburg, and Breyer — finding that *Solem* should control. *Lockyer*. The dissent found the majority's refusal to equate the life sentence without parole of *Solem* and Andrade's sentence allowing for parole only after 50 years unconvincing: "[A]n 87-year-old man released after 50 years behind bars will have no real life left, if he survives to be released at all." *Lockyer*, 538 U.S. at 79 (Souter, J., dissenting).

In the dissent's view, the second consecutive sentence for Andrade's theft of a handful of videotapes shortly after a similar theft was especially indefensible:

"[N]o one could seriously argue that the second theft of videotapes provided any basis to think that Andrade would be so dangerous after 25 years, the date on which the consecutive sentence would begin to run, as to require at least 25 years more. . . . The argument is irrational, and the state court's acceptance of it in

response to a facially gross disproportion between triggering offense and penalty was unreasonable . . . .

". . . If Andrade's sentence is not grossly disproportionate, the principle has no meaning." *Lockyer*, 538 U.S. at 82-83 (Souter, J., dissenting).

*Ewing* and *Lockyer* doom Van Dyke's Eighth Amendment challenge to the length of his sentence. Given the comparative seriousness of Van Dyke's offense and the comparative brevity of his sentence, he simply cannot meet the "extraordinary" or "extreme" standards necessary to override the legislature's comprehensive sentencing scheme and to establish a violation of the Eighth Amendment.

Van Dyke also is not entitled to relief under § 9 of the Kansas Constitution Bill of Rights. Our Supreme Court has declined to differentiate between the protections afforded by the federal and our state constitutional provisions, despite slight wording distinctions. *State v. Scott*, 265 Kan. 1, 5, 961 P.2d 667 (1998). We are bound to follow that precedent unless there is evidence the Supreme Court is departing from it. See *Ely v. Hitchcock*, 30 Kan. App. 2d 1276, 1284, 58 P.3d 116 (2002). There is no such evidence. We therefore expect our Supreme Court to construe § 9 of our Kansas Constitution Bill of Rights consistent with the United States Supreme Court's construction of the Eighth Amendment to the federal Constitution. See also *State v. Tyler*, 251 Kan. 616, 647, 840 P.2d 413 (1992) (quoting *State v. Nunn*, 247 Kan. 576, 580, 802 P.2d 547 [1990]) (ruling on § 9 claim; " '[t]he fact that the minimum sentence imposed by a trial court exceeds the life expectancy of the defendant has never been grounds, per se, for a finding that the sentence is oppressive or constitutes an abuse of discretion.' ").

## Method

We are guided in our examination of whether the method of Van Dyke's sentence violates the Eighth Amendment or § 9 by *Scott*, 265 Kan. 1, Syl. ¶ 2.

In *Scott*, the defendant was convicted of attempted aggravated sexual battery and placed on probation. He objected to a require-

fjment that he register as a sex offender under the Kansas Sex Offender Registration Act (KSORA), K.S.A. 22-4901 *et seq.*, and to public access to the registration information, characterizing it as cruel and unusual punishment as applied to him. A panel of our court concluded the provision qualified as cruel and unusual under § 9 of the Kansas Constitution Bill of Rights. *State v. Scott,* 24 Kan. App. 2d 480, 947 P.2d 466 (1997).

Our Supreme Court reversed, first noting that it traditionally had interpreted the Kansas Constitution as it did the federal Constitution. 265 Kan. at 5. It then ruled that a punishment's infliction of injury on the "reputational interests" of an offender did not render it cruel or unusual. "Rather, we consider whether the *method and effect* of the punishment is itself inhumane, inherently cruel, shocking, unacceptable, or offends human dignity." (Emphasis added.) 265 Kan. at 7; see also *State v. McCloud,* 257 Kan. 1, 6, 891 P.2d 324, *cert. denied* 516 U.S. 837 (1995) (neither length nor method of punishment shocks conscience or offends fundamental notions of human dignity). With that as its standard, our Supreme Court concluded that the registration requirements of the KSORA did not constitute cruel and unusual punishment as applied to Scott.

"The legislature has determined it is necessary for public safety to allow the public access to this collected information. Additionally, offenders have been placed on notice that they would be subject to the public disclosure provisions of the KSORA. Due to the nonpunitive intent and the concern for public safety in the KSORA, as well as the legislature's prerogative to set punishment for criminals, we do not see the public access provisions as so inhumane as to constitute cruel or unusual punishment, particularly where the allegedly injurious consequences of such access are due solely to the offenders' own criminal conduct.

. . . .

"Under the facts of this case, the punitive effect of the registration and notification provisions of the KSORA resulting from an interest in public safety are not so disproportionate to Scott's violent, sexually motivated crime that such registration and public access is deemed inhumane, shocking, barbarous, or contrary to fundamental notions of human dignity so as to constitute cruel and unusual punishment." *Scott,* 265 Kan. at 14-15.

As in *Scott,* the legislature has determined that it is necessary for public safety to imprison persons in Van Dyke's position. He

was on notice that his conduct merited the punishment he is receiving. There was no particularized punitive action on the part of the criminal justice system. In fact, Van Dyke received a sentence at the low end of the presumptive range. Any "allegedly injurious consequences" were due solely to his own conduct.

Under these circumstances, we cannot say that the method of Van Dyke's punishment is cruel and unusual under either the Eighth Amendment or § 9. It is not "inhumane, shocking, barbarous, or contrary to fundamental notions of human dignity." *Scott*, 265 Kan. at 15.

### Medical and Psychological Treatment

Van Dyke's last argument focuses primarily on his wife's inability to participate in his treatment while he is housed in the Hutchinson Correctional Facility and on testimony that his depression will deepen and cause him to lose his will to live.

First, we dispose of the concern that such a claim should have been advanced by way of a petition filed pursuant to K.S.A. 2002 Supp. 60-1501 in the district of Van Dyke's confinement rather than by motion pursuant to 60-1507. Van Dyke's counsel asserts that his client's placement was uncertain at the outset of this action. In the interests of judicial economy, we elect to address the merits of the claim here.

Deliberate indifference to an inmate's medical needs by prison officials violates the prohibition against cruel and unusual punishment, but, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103-06, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976).

There are two elements to such a claim. First, we must consider whether the claim involves an essential human need. See *Gillihan v. Shillinger*, 872 F.2d 935, 941 (10th Cir. 1989). If so, then we must consider whether prison officials are aware of the inmate's need yet fail to meet it in disregard of an excessive risk to the inmate's health or safety. *Darnell v. Simmons*, 30 Kan. App. 2d 778, 780-81, 48 P.3d 1278 (2002).

Food, clothing, shelter, medical care, and reasonable safety qualify as basic human needs. See *Helling v. McKinney*, 509 U.S. 25, 32, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993). Correctional system placement that ensures the attendance of an inmate's spouse at psychological treatment sessions does not. See 509 U.S. at 35-36 (inmate must prove both objective and subjective elements of deliberate indifference claim; objective element includes assessment of whether "society considers risk . . . so grave that it violates contemporary standards of decency to expose *anyone* unwillingly" to it). Van Dyke's claim fails.

Depression is an understandable and, no doubt, common condition of those confined to our state penal institutions. We are sympathetic. Nevertheless, neither the federal nor our state constitution requires such institutions to provide "the Cadillac care" Van Dyke demands here. In addition, if he and his family believe his spouse's attendance to be vital to his survival, it is within their power to have her relocate to facilitate such participation.

Although our reasoning differs from that of the district court, we agree with the result below. See *State v. Bryant*, 272 Kan. 1204, 1210, 38 P.3d 661 (2002).

Affirmed.