NOT DESIGNATED FOR PUBLICATION

No. 126,705

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRISTEN JEFFREY ROGERS,
*Appellant*.

## MEMORANDUM OPINION

Appeal from Butler District Court; JANETTE L. SATTERFIELD, judge. Oral argument held January 6, 2026. Opinion filed April 10, 2026. Affirmed in part, vacated in part, and remanded with directions.

*David L. Miller*, of The Law Office of David L. Miller, of Wichita, for appellant.

*Jarod M. Regier*, assistant county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., CLINE and COBLE, JJ.

CLINE, J.: Tristen Jeffrey Rogers appeals from the sentence imposed after he pled guilty to two counts of sexual exploitation of a child. Rogers argues the lifetime postrelease supervision ordered under K.S.A. 22-3717(d)(1)(G)(i) is cruel and unusual punishment for his crimes and is therefore unconstitutional as applied to him. And he claims the mandate in K.S.A. 22-4906(b)(1)(G) that he register as a sex offender for 25 years upon his convictions is also unconstitutional because it violates his due process rights.

1

Based on the facts of this case, and when applying the three-part test our Supreme Court established in *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978), we agree with Rogers that lifetime postrelease supervision is a constitutionally disproportionate punishment for his crimes under both section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. We therefore vacate that portion of his sentence and remand the case to the district court for resentencing.

As for the mandatory sex offender registration portion of his sentence, Rogers has not established that his due process rights under the Fourteenth Amendment to the United States Constitution and sections 1 and 18 of the Kansas Constitution Bill of Rights were violated. In *State v. N.R.*, 314 Kan. 98, 495 P.3d 16 (2021), our Supreme Court found that mandatory sex offender registration under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., does not violate a defendant's procedural due process rights. 314 Kan. at 112, 114-15. It held that a defendant receives sufficient notice and opportunity to be heard on whether they must register when they are adjudicated of the crime(s) subjecting them to KORA's registration requirements. 314 Kan. at 112, 114-15. We are bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). We have seen no such indication.

Rogers' substantive due process argument is similarly unpersuasive because K.S.A. 22-4906(b)(1)(G) does not establish an unconstitutional irrebuttable presumption that "all sex offenders are high-risk dangerous recidivists." What Rogers calls an irrebuttable presumption is actually a rule of substantive law based on a determination by our Legislature that, as a matter of public policy, those convicted of sexually violent offenses must register under KORA. We therefore affirm the part of Rogers' sentence requiring him to register as a sex offender for 25 years.

FACTUAL AND PROCEDURAL BACKGROUND

On March 14, 2021, Rogers downloaded child pornography into his Dropbox account when he clicked on a link sent to him in an online chatroom from someone he did not know. Through this link, Rogers saved 2,038 files to his Dropbox, 12 of which contained child pornography. After Rogers discovered the child pornography, he deleted the Dropbox application from his phone but did not delete the files from this Dropbox account. Rogers was 20 years old at the time.

Through the National Center for Missing and Exploited Children, Internet Crimes Against Children Task Force, investigators in Wichita received a cyber tip indicating that Rogers' Dropbox account contained at least two files containing child nudity. Pursuant to a search warrant, investigators accessed the Dropbox account and discovered the child pornography files.

In November 2021, law enforcement interviewed Rogers, and he admitted to viewing 10 videos or images containing child pornography. Rogers claims he looked at the videos for less than 15 minutes. Law enforcement also conducted a forensic examination of Rogers' phone. There were 10,459 pictures and 844 videos on Rogers' phone, none of which contained child pornography. And Rogers' search history and web history did not produce anything involving child pornography.

Rogers was charged with 12 counts of sexual exploitation of a child. In exchange for a guilty plea, the State agreed to dismiss 10 of the 12 counts and recommend probation. The plea agreement informed Rogers that he would be subject to lifetime postrelease supervision and 25 years of offender registration.

Before sentencing, Rogers filed motions arguing that lifetime postrelease supervision and 25 years of offender registration were unconstitutional punishments as

applied to him. Rogers asserted that lifetime postrelease supervision is cruel and unusual in his situation under the Eighth Amendment to the United States Constitution and section 9 of the Kansas Constitution Bill of Rights. He also argued that mandatory registration as a sex offender creates an irrebuttable presumption in violation of the Due Process Clause of the Fourteenth Amendment and sections 1 and 18 of the Kansas Constitution Bill of Rights.

At his sentencing hearing, Rogers presented testimony from several experts, including Dr. Mark Goodman, a clinical psychologist, Dr. Kelly Socia, a professor of Criminology and Justice Studies, and Gail Unruh-Revel, a director of sexual health services. Dr. Goodman testified about his psychological evaluation of Rogers and the results of extensive personality and sex offender testing he conducted. Dr. Goodman reported that Rogers scored from a low to a moderate risk of reoffending without treatment on some tests, a low risk of reoffending on other tests, and a moderate to high risk on other tests. Overall, Dr. Goodman assessed Rogers as having a moderate risk of reoffending but he opined that, with treatment, Rogers' risk of reoffending would lower considerably. Dr. Goodman acknowledged that the testing he performed was not geared towards possession of child pornography or sexual interest in children. But he did admit that—with respect to child pornography—the risk of recidivism is very low, especially with treatment. And he testified that he did not believe Rogers should be subject to lifetime supervision.

Dr. Socia testified that recidivism rates are especially low for offenders convicted of possession of child pornography, based on studies which found those rates to be between 3% and 7%. He also said recidivism rates are even lower for individuals, like Rogers, who are not pedophiles. Dr. Socia testified that it "makes no sense at all" to require Rogers to be listed on a sex offender registry, given his "very low likelihood of any future sex-based crimes." He also said it would be a "waste of resources to subject Mr. Rogers to lifetime supervision." When Dr. Socia was asked about the harm to society

4

caused by child pornography—for example, how trafficking and commercialization of child pornography creates a demand, and how that demand incentivizes the creation of more child pornography—he distinguished Rogers' case by pointing out Rogers' downloading of a package of 2,000 images which contained around 10 child pornography images was different from a person who was seeking out and specifically downloading child pornography.

Finally, Unruh-Revel highlighted Rogers' participation in treatment since his indictment and stated that she did not "fear for the community. . . . And [she does not] see him as someone that's a danger." She discussed testing she had performed on Rogers and remarked that he scored in the lower risk group for sexual recidivism, which she calculated at 3% and under for the next 15 years.

After hearing closing arguments from both sides, the district court ultimately denied both motions. It sentenced Rogers to 36 months' probation with an underlying prison sentence of 32 months, and imposed lifetime postrelease supervision and mandatory sex offender registration for 25 years.

REVIEW OF ROGERS' APPELLATE CHALLENGES

I. *Did the district court err in denying Rogers' motion to find lifetime postrelease supervision a cruel and unusual punishment as applied to his case?*

Under K.S.A. 22-3717(d)(1)(G)(i), anyone convicted of a defined "sexually violent crime" committed on or after July 1, 2006, and "released from prison, shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life." In K.S.A. 22-3717(d)(5), the Legislature designated the sexually violent crimes requiring lifetime postrelease supervision, including sexual exploitation of a child.

Rogers argues that lifetime postrelease supervision is cruel and unusual punishment under section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment as applied to him. He contends the district court erred when it denied his motion because its factual findings were not supported by substantial competent evidence and it wrongly concluded lifetime postrelease supervision was not cruel and unusual punishment for Rogers' crimes.

*Standard of review*

Appellate courts apply a bifurcated standard of review when assessing whether a sentence is cruel or unusual punishment in violation of section 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment. We review the district court's factual findings for substantial competent evidence without reweighing the evidence. The legal conclusions drawn from the factual findings are considered de novo. See *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012).

1. *Section 9 of the Kansas Constitution Bill of Rights*

Section 9 of the Kansas Constitution Bill of Rights provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." The Kansas Supreme Court has found that a "[p]unishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Freeman*, 223 Kan. at 367.

Freeman *analysis*

In *Freeman*, the Kansas Supreme Court identified three categories of inquiry (now known as the *Freeman* factors) that should be undertaken when evaluating whether a

particular sentence violates the Kansas Constitution's prohibition against cruel and unusual punishment:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

None of the *Freeman* factors are controlling, and a court should consider each. That said, one factor may weigh so heavily in a specific case that it determines the outcome. *State v. Funk*, 301 Kan. 925, 935, 349 P.3d 1230 (2015).

When discussing the *Freeman* factors as applied to Rogers, the district court said in its journal entry:

"*Freeman* found that punishment may be constitutionally impermissible although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity. The three part test to aid in administering this principle states: (1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present in society; relevant to this inquiry are the facts of the crime (in the case child pornography possession), the violent or non-violent nature of the offense, the extent of culpability for the injury resulting, and the penological purpose of the proscribed punishment. The child pornography market exploded with the advent of the internet and advanced digital technology. It is not a victimless crime. Each child involved

7

is a victim of sexual abuse and each image graphically memorializes the sexual abuse of that child. Further, online communities may also attract or promote new individuals to get involved in the sexual exploitation of children creating an even larger demand for sex images and victims along with child trafficking. However, these offenses are treated in Kansas as lower severity levels frequently resulting in probation. This Court is uncertain how such an offense is treated in other jurisdictions, and none were offered by counsel.

"Specific factors or individual factors related to this defendant as found by this Court are his risk that increases with age, overall moderate as opposed to low risk, the number of images. Additionally, not all sex offenders abuse alcohol or are cannabis dependent. In this Court's view, that additional and recent usage causes individual risk concerns. Defendant expressed viewing pornography gave him a thrill—reduced his depression. He also thought about selling pornography. As applied to this defendant 25-year registration is not disproportionate to the crime. An inability to control his behavior, anger, and drug abuse can all put him at risk of reoffending."

### Freeman *factor 1: nature of the offense and character of the offender*

The first *Freeman* factor is inherently factual, focusing on the specifics of the crime and the particular characteristics of the defendant. See *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008). Yet the district court did not adequately address the specifics of Rogers' crimes or his individual circumstances. Instead, it was mainly concerned with the harms caused by the child pornography trade in general.

Rogers does not challenge the unfortunate realities of the child pornography trade which the court recounted, and we agree they are relevant when evaluating this factor. That said, the point of the first *Freeman* factor is to consider the situation at hand, not just the generalized harm caused by the category of crime at issue. The question is whether lifetime postrelease supervision is constitutionally proportionate in Rogers' case, not whether it is a constitutionally proportionate sentence for any offender who possessed child pornography. As a result, application of this factor requires a more meaningful analysis than the district court appears to have conducted.

To begin, the court did not seem to consider how these generalized harms apply in Rogers' situation. For example, the record does not show that Rogers was seeking out child pornography or interacting in an online community for that purpose. Nor does he have a history of viewing child pornography. The forensic examination of his cell phone found 10,459 pictures and 844 videos, none of which contained child pornography. And nothing in his internet search or web history produced anything involving child pornography. Ultimately, the court failed to explain how Rogers' one time download of 12 illegal videos and images embedded in the more than 2,000 he downloaded when he clicked on the link somehow increases child trafficking or societal demand for child pornography.

The first *Freeman* factor specifically notes "the facts of the crime" and "the extent of culpability" of the defendant for the injury resulting from the crime are relevant to the inquiry under this factor. The court's general statements about the harms of child pornography are true and should not be diminished or ignored as they apply in all child pornography cases. But reliance on these generic principles alone—without considering how or whether they apply in a specific case as the first *Freeman* factor requires—would render the first *Freeman* factor virtually meaningless in any child pornography case.

When evaluating other relevant considerations under this factor—like the degree of danger Rogers presents to society and how the penological purposes for lifetime postrelease supervision are served in this situation—the court's analysis was similarly inadequate. In *Mossman*, the court identified the penological purposes for lifetime postrelease supervision as retribution, deterrence, incapacitation, and rehabilitation. 294 Kan. at 912. Yet the only purpose the court discussed here was deterrence; that is, Rogers' projected recidivism rate. Without discussing the other purposes, the court's analysis was necessarily incomplete.

And regarding Rogers' recidivism rate, Rogers claims the court's factual findings on this issue are not supported by substantial competent evidence. He contends the court focused mostly on an overall assessment of his recidivism rate based on a battery of tests (most of which were not specific to possession of child pornography) without taking into account several factors which the expert who administered the tests said would impact that rate or the experts' assessments of the suitability of lifetime postrelease supervision in his case.

At first blush, Rogers' argument has some appeal because the district court's evaluation of his recidivism risk was rather cursory. For example, although, according to Dr. Goodman's test results, Rogers had an overall moderate risk of reoffending, Dr. Goodman testified that risk was lowered considerably by the treatment Rogers was receiving. Rogers correctly asserts that the court did not appear to account for that testimony, or Dr. Goodman's and Dr. Socia's opinions that lifetime postrelease supervision was unnecessary in this case. Instead, the court seemed to take the test results at face value, despite Dr. Goodman's testimony that this recidivism testing was not geared towards possession of child pornography or sexual interest in children. The court also did not appear to give any weight to the fact that Rogers was not diagnosed with pedophilia, which Dr. Socia testified further reduced his recidivism rate.

Even so, substantial competent evidence is simply legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). It "does not require evidence to *prove* a fact; rather, it simply requires evidence to sufficiently *support* the fact-finder's conclusion." *State v. Morley*, 312 Kan. 702, 712, 479 P.3d 928 (2021). We cannot "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *Granados v. Wilson*, 317 Kan. 34, 41, 523 P.3d 501 (2023). Based on these standards, we cannot say the district court's finding that Rogers' overall recidivism rate was moderate is not supported by substantial competent evidence because that was how

Dr. Goodman's testing assessed Rogers' recidivism rate if Rogers did not undergo any treatment.

The district court's statement that Rogers' recidivism rate increases with age presents another story. Rogers scored a 1 on the Child Pornography Offender Risk Tool (CPORT) test, "due only to his age." This is because, according to this test, "'[y]ounger age is well established as a risk factor for recidivism across different types of offenders, including sex offenders more generally . . . and child pornography offenders specifically.'" But Dr. Socia stated Rogers' score of 1 was "exceptionally low, and suggests no pedophilic or hebephilic interest." He also stated in his report that based on this score, "there seems to be little to no public safety benefit to requiring registration or imposing the assorted related restrictions that come with registration." And this test was one of the many the court used as a basis to summarize Rogers' overall recidivism risk as moderate. So, at best, the court's consideration of this score was duplicative since it had already considered Rogers' overall recidivism risk based on all the tests—including the CPORT assessment. And, at worst, the court considered the score out of context based on Dr. Socia's explanation of the score's meaning. Additionally, there is evidence in the record to contradict the court's finding because Unruh-Revel testified that Rogers' risk of reoffending over the course of the next 15 years was 3% or less, which is lower than the average client at 9% and under for that same period. For these reasons, we find the court's reliance on its additional determination that Rogers' recidivism risk would increase with age was in error because this independent finding was not supported by substantial competent evidence.

As for the court's statement that it believed Rogers' alcohol and cannabis use increased his risk of recidivism, there does not appear to be any evidence in the record linking alcohol use to an increased risk of recidivism—especially child sex crime recidivism. None of the experts testified that his use presented an additional risk, and the court did not explain the basis for this finding. Similarly, none of the experts opined that

Rogers' cannabis use increased his recidivism rate. Rogers admitted he was high on marijuana when he clicked on the link sent to him, and it is true that Dr. Goodman recommended Rogers undergo outpatient drug treatment. But Dr. Goodman recommended treatment "to help [Rogers] stop his cannabis dependence." He did not say Rogers' cannabis use increased his risk of committing child sex crimes in the future. So we do not find this factual finding by the court to be adequately supported.

Next, the district court's reliance on the number of images involved to support its assessment of Rogers' danger to society or the penological purposes of lifetime postrelease supervision seems misplaced or contradicted by the evidence. Out of the 2,038 images and videos Rogers downloaded when he clicked on the link, only 12 contained child pornography. And when Rogers' phone was searched, none of the 10,459 pictures or 844 videos were illegal. Given the multitude of legal images compared to the illegal ones, this fact would seem to cut in Rogers' favor, not against him as the court weighed it. Under these circumstances, we fail to see how the number of images involved increased Rogers' danger to society or culpability for his crimes and therefore find this statement is also insufficiently supported.

As for the district court's reliance on Rogers' alleged statements that viewing pornography gave him a thrill and that he thought about selling pornography, Rogers asserts in his brief that he told law enforcement that possession of the illegal videos "initially gave him a 'spark,'" and he thought about selling the videos. Since Rogers admits making these statements and does not challenge the court's findings on these facts, we assume the findings are supported by substantial competent evidence. See *State v. McMullen*, 290 Kan. 1, 5, 221 P.3d 92 (2009) (if appellate record is inadequate, the appellate court presumes the district court's findings were properly supported).

While it is a close call, all in all, there is substantial competent evidence to support the court's finding that Rogers' recidivism risk is at least concerning and, as such, would

12

present one consideration in support of imposing lifetime postrelease supervision. Still, the court seemed to ignore the other considerations that must be taken into account when applying the first factor of the *Freeman* test. As mentioned, the court did not address Rogers' circumstances or culpability for his crimes nor did it discuss the other penological purposes for lifetime postrelease supervision—retribution, incapacitation, and rehabilitation—which are all impacted by his circumstances and culpability. 294 Kan. at 912.

To support his argument on this aspect of the test, Rogers compares his circumstances to those in *State v. Proctor*, 47 Kan. App. 2d 889, 898, 280 P.3d 839 (2012) (*Proctor I*), and *State v. Proctor*, No. 104,697, 2013 WL 6726286 (Kan. App. 2013) (unpublished opinion) (*Proctor II*). In these cases, the 19-year-old defendant pled guilty to several child sex crimes after he, on multiple occasions, "cajoled T.C. [a 12-year-old family friend] into having manual and oral contact with [his] penis." 2013 WL 6726286, at *2. This court found that lifetime postrelease supervision was unconstitutional as applied to that situation.

When explaining why the first *Freeman* factor weighed in Proctor's favor, this court pointed out that

> "Proctor was barely an adult himself at the time of the offenses. He had no juvenile or adult criminal record and, thus, no demonstrated incorrigibility. And nothing indicated Proctor was a serial sex offender with a trail of victims. Proctor had been a victim of sexual abuse in his adolescence and went without any professional help in coping with that trauma. None of that, of course, in any way excuses Proctor's actions in victimizing T.C. Nor does it undo the trauma to T.C. But it does suggest a defendant who, as the district court found, would very likely benefit from mental health therapy and counseling and sex offender treatment more than from incarceration." *Proctor II*, 2013 WL 6726286, at *4-5.

Rogers argues that, as in *Proctor II*, he was young, had a history of childhood abuse, and was without any criminal history. And Rogers contends that his crimes were even less severe than those in *Proctor II* because he had no contact crimes. He also argues that, while possession of child pornography is not a victimless crime by any means, the direct effect on the well-being of a particular child is more attenuated than that seen in *Proctor II*.

The State, for its part, argues that Rogers is unable to rely on both *Proctor* cases because they were limited to their facts and we relied on Proctor's potential for lifetime imprisonment if his postrelease supervision were revoked for a nonperson felony conviction in determining lifetime postrelease supervision was constitutionally disproportionate to Proctor's crimes. Since then, K.S.A. 75-5217 was amended to allow the Prisoner Review Board discretion to decide how much time an offender will serve in prison. See *State v. Hardy*, No. 113,942, 2016 WL 3570479, at *5 (Kan. App. 2016) (unpublished opinion) (noting *Proctor II* is not dispositive for these reasons). So while the Board could order an offender to serve a lifetime prison sentence, it is no longer required to do so.

While the State's assertions are true, the circumstances in both *Proctor* cases and this case are nearly identical, and Rogers correctly highlights factors that make his crimes less severe than Proctor's. Although we relied heavily on the fact that Proctor could face a lifetime in prison—for committing an offense while on supervision which would otherwise result in probation—in finding lifetime postrelease supervision was unconstitutional as applied to Proctor, that was not the only basis for our decision. Rogers correctly notes other pertinent facts we relied on that related to Proctor's culpability and potential danger to society which are equally persuasive here. And as we noted in *Proctor II*, it is hard to reconcile the district court's finding that Rogers presents a danger to society with its finding that his crimes warranted probation rather than incarceration. 2013 WL 6726286, at *4.

14

In comparing the gravity of Rogers' offense with the severity of his sentence, the district court was required to conduct a case-specific inquiry. It does not appear to have done that here. It did not discuss the facts of Rogers' crimes, Rogers' mental state or motive, or his lack of criminal history, and some of the facts it relied on were not supported by substantial competent evidence. And given Rogers' youth, history of childhood abuse, and lack of criminal history, the penological purposes of retribution and deterrence apply to him with much less force. For these reasons, we find the district court improperly weighed the first *Freeman* factor and concluded in error that this factor did not weigh heavily in Rogers' favor.

Freeman *factor 2: comparison of punishments in Kansas*

Below and on appeal, Rogers argued the second *Freeman* factor should weigh in his favor because the imposition of lifetime postrelease supervision is disproportionate when compared with the terms of postrelease supervision imposed for other violent crimes. For example, the longest term of postrelease supervision for second-degree murder or multiple violent aggravated robberies is 36 months.

This argument was raised in both *Mossman*, 294 Kan. at 916, and *State v. Cameron*, 294 Kan. 884, 893, 281 P.3d 143 (2012), wherein the court found that the difference in proportionality between lifetime postrelease supervision in sexually violent crimes and shorter supervision terms for other violent crimes was not so significant as to justify weighing the second factor in those defendants' favor. But, importantly, the court based those findings on the factual circumstances of those cases, including how the penological purposes applied there, the seriousness of the crimes involved, and other concerns the court had expressed in relation to the first *Freeman* factor in both cases. See *Mossman*, 294 Kan. at 916; *Cameron*, 294 Kan. at 893.

Just as with the first *Freeman* factor, the district court did not meaningfully discuss the second *Freeman* factor. This factor requires it to consider "[a] comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect." 223 Kan. at 367. Yet all the court said regarding this factor was: "However, these [child pornography] offenses are treated in Kansas as lower severity levels frequently resulting in probation."

While it could be said the district court found part of a defendant's punishment for child pornography crimes is less severe than for more serious crimes—probation instead of prison—it failed to address the other aspects of their punishment, namely the term of postrelease supervision. Nor did it address Rogers' argument that, although the court found the sentences in both *Mossman* and *Cameron* were not disproportionate when compared to sentences for more severe crimes, those determinations were based, in part, on the factual circumstances of those cases. *Mossman*, 294 Kan. at 916; *Cameron*, 294 Kan. at 893.

When compared with *Mossman* and *Cameron*, Rogers' circumstances seem to reflect the disproportionality he asserts. Those cases both involved contact crimes, and the first *Freeman* factor weighed against those defendants. Yet Rogers' crimes were indirect, and the first *Freeman* factor weighs heavily in his favor.

In both *Mossman* and *Cameron*, the momentum of the first *Freeman* factor against the defendants carried over into how the court weighed the second *Freeman* factor. And even though the court ultimately found that the second *Freeman* factor did not "outweigh" the first *Freeman* factor in those cases, it still acknowledged the defendants made a "valid point" that they would be subject to lifetime restrictions on their freedom and would be constrained for longer than if they had committed second-degree murder. *Mossman*, 294 Kan. at 917; see *Cameron*, 294 Kan. at 893. That is, even if the method of

16

punishment was not disproportionate between the crimes (since second-degree murder carries a longer prison sentence than the sexually violent crimes at issue in those cases), the ultimate sentence is longer for the sex crimes than for murder.

Notably, the *Freeman* court mentioned its three-part test should be applied "[i]n determining whether the *length* of a sentence offends the constitutional prohibition against cruel punishment." (Emphasis added.) 223 Kan. 362, Syl. ¶ 2. And it found the sentence involved in *Freeman* was not "so cruel or unusual either in its method or its *length* that it shocks the conscience and offends fundamental notions of human dignity so as to be constitutionally impermissible." (Emphasis added.) 223 Kan. 362, Syl. ¶ 3. So both the length and method of punishment are relevant to the second *Freeman* factor. Yet the district court did not consider the length of the postrelease supervision aspect of Rogers' punishment.

For these reasons, we find the district court improperly weighed the second *Freeman* factor by not considering all aspects of Rogers' punishment, including its overall length. And if the court in *Mossman* and *Cameron* believed that circumstances weighing against a defendant under the first *Freeman* factor impact an evaluation of the second *Freeman* factor, we see no reason why circumstances weighing in the defendant's favor should not similarly be considered. And, after doing so here, we find an evaluation of the second *Freeman* factor weighs in Rogers' favor and renders the lifetime term of his supervision suspect or, at least, supports our proportionality assessment under the first *Freeman* factor.

Freeman *factor 3: comparison with punishments in other states*

The third *Freeman* factor requires the court to compare Rogers' punishment with punishments in other jurisdictions for the same offense. 223 Kan. at 367. As to this factor, the district court said: "This Court is uncertain how [child pornography offenses

are] treated in other jurisdictions, and none were offered by counsel." Therefore, it appears the court concluded it could not analyze the third *Freeman* factor.

But in reviewing Rogers' motion to find lifetime postrelease supervision unconstitutional as applied to him, Rogers relied on the court's consideration of this factor in both *Mossman* and *Proctor II*. That is, he acknowledged that in *Mossman* the court found only a small minority of jurisdictions impose lifetime postrelease supervision like Kansas, but it still did not find this violated section 9 of the Kansas Constitution Bill of Rights. He then argued away the significance of this finding by pointing out the *Freeman* factors are to be considered collectively, so one standing alone is not determinative. See *Proctor II*, 2013 WL 6726286, at *8. And he noted this court found that the third factor did not weigh as heavily as the first or second in *Proctor II*, because other states "would seem to have considerably less to say" about how Kansas courts should apply the constitutional safeguard of section 9. 2013 WL 6726286, at *8.

Based on this record, the district court erred in failing to make findings on the third *Freeman* factor. That said, since this factor does not carry as much weight as the other two, the court's failure to evaluate the third *Freeman* factor does not impact our analysis. We acknowledge that our Supreme Court has noted Kansas is not alone in mandating lifetime postrelease supervision for sexually violent offenses, but when weighed alongside the other two *Freeman* factors, we do not find this to change our ultimate conclusion on the proportionality of Rogers' sentence.

To conclude, we find the district court erred in weighing the first two *Freeman* factors, in failing to consider the third *Freeman* factor, and in concluding that lifetime postrelease supervision was constitutionally permissible under section 9 of the Kansas Constitution Bill of Rights as applied to Rogers. The goal of the *Freeman* test is determining whether the punishment fits the crime. In our view, lifetime postrelease supervision does not fit Rogers' crimes.

Relying on *State v. Riffe*, 308 Kan. 103, 112, 418 P.3d 1278 (2018), our concurring colleague would remand this case to the district court for another hearing because our colleague believes, like in *Riffe*, that the district court did not consider all three Freeman factors. But we see significant distinctions between Rogers' and Riffe's cases.

In *Riffe*, the parties argued the constitutionality of lifetime postrelease supervision as it applied to Riffe but presented no evidence. Here, Rogers presented significant evidence to support his motion to find lifetime postrelease supervision unconstitutional as applied to him. Rogers presented the testimony of three witnesses together with several exhibits that included psychological evaluation assessments, expert reports discussing recidivism rates for sex offenders, a drug and alcohol evaluation, a letter from Rogers' current employer, and a letter from someone from his church. In fact, the district court commended Rogers for providing "more testing, more tools, more information" than the court had ever received for a particular offender.

In *Riffe*, the court concluded lifetime postrelease was unconstitutional as applied to Riffe based only on the first *Freeman* factor. It acknowledged the three *Freeman* factors but determined the second two factors did not apply. *Riffe*, 308 Kan. at 107-09. The district court made no factual findings on factors two or three, nor did it explicitly address these factors in its written statements of findings. *State v. Riffe*, No. 113,746, 2016 WL 937869, at *3-4 (Kan. App. 2016) (unpublished opinion). In deciding to remand the case to the district court, our Supreme Court held the district court made insufficient factual findings regarding *Freeman* factor one and made a legal error when it "purposefully disregarded" *Freeman* factors two and three. *Riffe*, 308 Kan. at 110-12. We do not have a similar legal error in Rogers' case. Here, the district court addressed all three factors. It found the first two *Freeman* factors weighed for the State and then mistakenly concluded the parties presented no evidence on the third factor. We are not faced with an

19

insufficient record but with findings that are not supported by substantial competent evidence.

When our court reversed the district court's decision in *Riffe*, we construed the district court's decision that the second two *Freeman* factors did not apply to mean the district court concluded those factors weighed for the State. *Riffe*, 308 Kan. at 109-10. The Kansas Supreme Court took issue with this approach, commenting that our court should have remanded the case for consideration under the proper legal standard rather than substituting its judgment to fill in the holes left by the district court record. 308 Kan. at 110. Here, we do not fill in any gaps by the district court, we simply find it did not adequately consider the factors that weigh in Rogers' favor and, thus, that its decision to find lifetime postrelease supervision constitutional as applied to Rogers is unsupported by substantial competent evidence.

Another motivation for the Kansas Supreme Court's remand of *Riffe* seemed to be the inconsistency between the district court's decision on the first *Freeman* factor and the comments it made at Riffe's sentencing. That is, while the Supreme Court did say it was unclear whether the district court considered all the categories under the first *Freeman* factor, it seemed more baffled by the court's ultimate decision to find lifetime postrelease supervision unconstitutional in light of contradictory comments the court made. For instance, the district court commented on the violent nature of Riffe's crime and also found Riffe presented a significant enough threat to public safety that it sentenced him to the aggravated prison term. *Riffe*, 308 Kan. at 110-11; *Riffe*, 2016 WL 937869, at *8. That is, the court's own actions and comments at sentencing countered its conclusion that Riffe's character demonstrated he did not pose a significant enough threat to public safety to warrant lifetime postrelease supervision. 2016 WL 937869, at *8. And our court noted the district court relied heavily on the rationale in the *Proctor* decisions which found lifetime postrelease supervision unconstitutional, yet "[n]one of the factors the court

relied on in reaching its decision in *Proctor I* and [*Proctor*] *II* were present in Riffe's case." *Riffe*, 2016 WL 937869, at *9.

While we respect our colleague and her difference of opinion, we believe the record is sufficient to reach a determination as to whether the district court properly weighed all three *Freeman* factors. The district court commented that it had "more of a factual basis here than most cases have to . . . argue the Constitutionality of these provisions," but it was reluctant to declare lifetime postrelease supervision unconstitutional for Rogers since it believed it involved "issues that probably ought to be taken up on appeal." Under these circumstances, we do not believe it necessary or productive to remand the case for another hearing on these factors.

2. *Eighth Amendment to the United States Constitution*

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The United States Supreme Court has held: "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

Constitutional challenges to penal sanctions as cruel and unusual punishment under the Eighth Amendment take one of two forms: categorical or case specific. A categorical challenge can be based on the nature of the offense, the characteristics of the offender, or a combination of both. See *Graham*, 560 U.S. at 59-61 (death penalty unconstitutional for nonhomicide crimes against individuals); *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (death penalty unconstitutional under the Eighth Amendment for defendants committing crimes as juveniles, i.e., under

the age of 18); *State v. Williams*, 298 Kan. 1075, 1086, 319 P.3d 528 (2014) (involving Eighth Amendment challenge to imposing lifetime postrelease supervision on first-time offenders over age 18 convicted of crimes involving possession of child pornography).

By contrast, a case-specific challenge contends the imposition of a given sentence, typically incarceration for a term of years or life, is grossly disproportionate to the circumstances of a particular criminal incident and offender and, therefore, violates the prohibition on cruel and unusual punishment. That sort of proportionality depends on the facts of a given case and directly affects only the particular defendant. See *Graham*, 560 U.S. at 59-60.

*Eighth Amendment challenge to sentence proportionality*

While both challenges consider essentially the same factors, an Eighth Amendment challenge differs from the section 9 analysis by requiring an initial disproportionality hurdle. The United States Supreme Court has directed that

> "[a] court must begin by comparing the gravity of the offense and the severity of the sentence. '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [Citations omitted.]" *Graham*, 560 U.S. at 60.

Thus, while the *Freeman* test for constitutionality under section 9 considers the three factors collectively, under the Eighth Amendment proportionality test the first step is determining whether the sentence is grossly disproportionate to the crime, and if so, then the court proceeds to the remaining steps of comparing the sentence with others in

the same and differing jurisdictions. See *Mossman*, 294 Kan. at 922; *Proctor II*, 2013 WL 6726286, at *8.

In comparing the gravity of Rogers' crimes to the severity of his sentence under the first step of the Eighth Amendment proportionality test, we note that Rogers committed contactless crimes, at a young age, with no criminal history, and subsequently submitted to evaluation and treatment to reduce the risk of reoffending. He received 36 months' probation for the crimes but will be subject to postrelease supervision for the remainder of his life.

As for the severity of his sentence, our Supreme Court examined the severity of a sentence of lifetime postrelease supervision in *State v. Dull*, 302 Kan. 32, 351 P.3d 641 (2015), observing:

> "'Mandatory lifetime postrelease supervision includes a general requirement that the person cannot commit a new criminal offense and may include several other specific "conditions targeted toward facilitating rehabilitation, restitution, and safe reintegration into society." These conditions may include payment of costs, fines, and restitution; completing educational requirements; performing community service; reporting to a supervising officer; and abiding by other special conditions allowed by administrative regulations and orders. K.S.A. 21-4703(p) (defining "postrelease supervision"); K.S.A. 22-3717(m) (listing possible conditions).'
> "'[W]hile the sentence is lengthy, lifetime postrelease supervision is not as harsh a punishment as imprisonment and is aimed at safely integrating a sex offender into society and protecting the public.' However, 'Kansas' provision [mandatory lifetime postrelease supervision] is more severe than most other jurisdictions.' [Citations omitted.]" *Dull*, 302 Kan. at 53.

When evaluating the severity of this aspect of Dull's sentence, the court considered the standard conditions of postrelease supervision listed on the Kansas Department of

23

Corrections website. 302 Kan. at 53-55. The current standard conditions do not appear to have changed significantly since *Dull*:

        1. Reporting and Travel: Upon release from the institution, the offender must agree to report as directed to the assigned parole officer and follow his/her instructions in reporting on a regular basis and keep the officer continuously informed of the offender's residence and employment. If it becomes necessary that the offender travel outside of the offender's assigned parole district (as determined by the parole officer) or the State of Kansas, the offender will obtain advance permission from his/her parole officer.

        2. Laws: The offender shall obey all federal and state laws, municipal or county ordinances, including the Kansas Violent Offender Registration Act. If the Kansas Offender Registration Act is applicable, the offender will register with the local Sheriff's Office within 10 days of arrival in the county of residence upon moving to any other county in Kansas. Changes in residence within the same county require written notification to the Sheriff's Office. If the offender is arrested for any reason, the offender will notify his/her parole officer at the earliest allowable opportunity.

        3. Weapons: An offender will not own, possess, purchase, receive, sell or transport any firearms, ammunition or explosive device, or any device designed to expel or hurl a projectile capable of causing injury to persons or property, or any weapon prohibited by law.

        4. Personal conduct: An offender will not engage in assaultive activities, violence, or threats of violence of any sort.

        5. Narcotics/Alcohol: An offender will not illegally possess, use or traffic in any controlled substances, narcotics or other drugs as defined by law except as prescribed by a licensed medical practitioner. The offender will not consume any mind-altering substances, and agrees and consents to submit to a blood, Breathalyzer or urine test at the direction of the parole officer. At no time will the offender consume intoxicating liquor, including beer or wine, without written permission from his/her parole officer. At no time

will an offender become intoxicated from the consumption of any substance, including, but not limited to, wine, beer, glue or paint.

6. Association: An offender will not associate with persons engaged in illegal activity and will obtain written permission from the parole officer and institutional director to visit or correspond with inmates of any correctional institution.

7. Employment: The offender agrees to secure and maintain reasonable, steady employment within 45 days of release from prison or residential treatment unless excused for medical reasons or an extension of time is given by his/her parole officer. The offender agrees to notify his/her employer of current and prior (non-expunged) adult felony convictions and status as an offender.

8. Education: The offender agrees to make progress toward or successfully complete the equivalent of a secondary education if the offender has not completed such by the time of the offender's release and are deemed capable, as determined by their parole officer.

9. Costs: The offender agrees to pay restitution, court costs, supervision fees and other costs as directed by the offender's parole officer.

10. Treatment/Counseling: The offender agrees to comply with any relapse prevention plan and the recommendations of any treatment or counseling, or assessment program which is completed during the offender's incarceration or while under supervision. The offender agrees to follow any directives given to the offender by the offender's parole officer regarding evaluations, placement and/or referrals. The offender agrees to submit to polygraph examinations as directed by the offender's parole officer and/or treatment provider.

11. Victim: The offender agrees to have no contact with the victim(s) in the offender's case(s) or the victim's family by any means including, but not limited to, in person, by phone, via computer, in writing or through a third party without the advance permission of the offender's parole officer.

12. Search: The offender agrees to be subjected to a search by parole officers of his/her person, residence, and any other property under his/her control.

13. Special Conditions: The offender must agree to abide by special condition(s) set forth, as well as to comply with instructions which may be given or conditions imposed by the offender's parole officer from time to time as may be governed by the special requirements of the offender's situation. See *Dull*, 302 Kan. at 53-55; https://www.doc.ks.gov/victim-services/information/conditions-of-post-release-supervision.

Based on these restrictions, the court observed in *Dull* that "[w]hile the postrelease conditions are not confinement per se, they do restrain one's freedom with significant restrictions and limitations." 302 Kan. at 55. We agree. And when comparing these consequences to the circumstances of Rogers' crimes, we find his punishment to be grossly disproportionate.

Since we find Rogers has satisfied the first step of his Eighth Amendment challenge, we thus move on to consider the next two steps. As mentioned, these steps consider essentially the same components as the second and third *Freeman* factors, so we need not repeat our analysis of those factors here. The rationale for finding Rogers' sentence constitutionally disproportionate under the second *Freeman* factor is equally sufficient to validate our initial judgment under the Eighth Amendment test that Rogers' sentence is grossly disproportionate to his crimes. See *Graham*, 560 U.S. at 60. And the third factor or step does not carry the same significance as the first two factors or steps, nor does it change our conclusion.

Thus, under both section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment, lifetime postrelease supervision is constitutionally impermissible as applied to Rogers.

*Lifetime postrelease supervision is a punishment.*

When explaining its decision to find this aspect of Rogers' sentence constitutional, the district court stated that the Kansas Supreme Court has found lifetime postrelease supervision is not a punishment. The district court characterized it as a civil constraint, noting this means it cannot be considered unconstitutional cruel and unusual punishment. This assertion is incorrect. In both *Mossman* and *Cameron*, our Supreme Court extensively discussed lifetime postrelease supervision as a punishment, though it found the punishment was not cruel or unusual in those situations.

It is unclear how the district court factored this incorrect assumption into its analysis of Rogers' claims. That is, it may have been an alternative basis for its decision or it may have just been an errant remark. In any event, to the extent that the court relied on this misunderstanding as a basis for its decision that lifetime postrelease supervision was not cruel and unusual punishment in Rogers' case, such reliance was in error.

*Conclusion*

After considering the circumstances of this case, in light of the *Freeman* factors and similar considerations under the Eighth Amendment proportionality analysis, we find lifetime postrelease supervision is an unconstitutionally disproportionate punishment for Rogers' crimes. The observations by Justice Johnson in his dissenting opinion in *Mossman*, 294 Kan. at 931 (Johnson, J., dissenting), are equally applicable here. Rogers was 20 years old when he committed this offense. Like Mossman, with lifetime postrelease supervision, Rogers will not experience another day of freedom the rest of his life. The government can control what he does and where he goes for the next 40, 50, perhaps even 60 or 70 years. See 294 Kan. at 931. That lifelong punishment is the result of Rogers clicking on a link to download 2,038 images which he did not know contained 12 illegal videos or images involving child pornography and which, after determining

27

their content, he deleted from his phone and did not view again. We therefore vacate this portion of his sentence.

II. *Did the district court err in denying Rogers' motion for relief from mandatory registration as a sex offender?*

Rogers next argues that mandatory registration as a sex offender without any mechanism for individualized determination of his recidivism risk violates his rights under sections 1 and 18 of the Kansas Constitution Bill of Rights and the Fifth and Fourteenth Amendments to the United States Constitution. He contends that section 1 protects a person's reputation and "right of personal autonomy" and section 18 guarantees the right to a remedy by due course of law for violation of those rights. And he claims that mandatory registration creates an irrebuttable presumption that all sex offenders are high-risk for reoffending, foreclosing his ability to disprove that he is not at high risk to reoffend in violation of his due process rights under the Fifth and Fourteenth Amendments.

*Standard of review*

The constitutionality of a statute is a question of law over which we exercise unlimited review. This court presumes that statutes are constitutional and must resolve all doubts in favor of a statute's validity. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

> *The Kansas Supreme Court has rejected the argument that a defendant is entitled to additional due process beyond the original adjudication of the crime which subjects them to KORA's requirements.*

In *State v. N.R.*, the defendant made the same argument under sections 1 and 18 that Rogers makes here. Although the Kansas Supreme Court agreed an individual's reputation is a protected liberty interest under section 1, it held KORA did not violate

28

section 18 because it found a defendant "is not entitled to any additional process beyond [their] original adjudication before being subjected to KORA's registration requirements." 314 Kan. at 114-15. This is because the only fact relevant to whether registration is required is the existence of the adjudication. 314 Kan. at 112, 114-15.

We are duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). We see no such indication. As in *N.R.*, because Rogers is not challenging the due process afforded in his original adjudication, his procedural due process rights were not violated by requiring him to register as a sex offender once he was convicted of a sexually violent crime.

*KORA does not create an unconstitutional irrebuttable presumption.*

As for his claim that KORA creates an irrebuttable presumption in violation of his rights under the Fifth and Fourteenth Amendments, Rogers mischaracterizes the statutory registration requirement as an "irrebuttable presumption" that sex offenders will reoffend. What Rogers calls an irrebuttable presumption is actually a substantive rule of law based on a determination by the Legislature that, as a matter of public policy, those convicted of sexually violent offenses must register.

As the State points out, under K.S.A. 60-413, "[a] presumption is an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." See *State v. Slusser*, 317 Kan. 174, 188, 527 P.3d 565 (2023) (defining "presumption" as "a rule of law that requires the fact-finder to draw a certain conclusion from a proven fact or set of facts in the absence of contrary evidence"). Yet neither the district court nor a jury is required to engage in any factfinding to determine the applicability of the registration requirement.

29

As the court noted in *N.R.*, KORA's registration requirements turn on an offender's conviction alone.

Rogers argues that KORA creates an irrebuttable presumption "that all sex offenders are high-risk for reoffending," because it mandates sex offender registration for a set number of years. He relies on two cases—*Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974), and *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)—in which the United States Supreme Court held that the government could not establish an "irrebuttable presumption" which classified people for a burden or benefit without determining the individual merit of their claims. *LaFleur*, 414 U.S. at 645. But recent analysis of the rationale in these and other irrebuttable presumption cases reveals that the decisions were actually based on an equal protection rationale rather than the due process claim that Rogers raises. See 3 Treatise on Const. L. § 17.6 (Irrebuttable Presumptions); see also *Catlin v. Sobol*, 93 F.3d 1112, 1118 (2d Cir. 1996) ("'By masking substantive decisions in procedural language, the Supreme Court, in the irrebuttable presumption cases, confused due process and equal protection analysis.'") (quoting 2 Rotunda and Nowak, *Treatise on Constitutional Law*, § 17.6 [1992]); *Brennan v. Stewart*, 834 F.2d 1248, 1258 (5th Cir. 1988) ("The 'irrebuttable presumption' doctrine was a strange hybrid of 'procedural' due process and equal protection invented by the Supreme Court in the early 1970s, and laid to rest soon after."). And Rogers makes no equal protection arguments.

Moreover, just because KORA mandates certain consequences for defendants convicted of certain offenses does not mean it creates an irrebuttable presumption. If this were true, every law establishing a summary classification could be recast as an irrebuttable presumption. For example, underage drivers could argue statutory age requirements for operating motor vehicles create irrebuttable presumptions that underage individuals are not competent drivers. See Phillips, *Irrebuttable Presumptions: An Illusory Analysis*, 27 Stan. L. Rev. 449, 463 (1975). Similarly, underage voters or those

wishing to purchase alcohol could also challenge the logic of statutory classifications, seeking to rebut the claimed presumptions prohibiting them from engaging in the desired action. See *LaFleur*, 414 U.S. at 658 (Rehnquist, J., dissenting).

Likewise, in *Michael H. v. Gerald D.*, 491 U.S. 110, 120, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989), the Court examined a claim that a California statute which presumes the husband's paternity for children born to married women living with their husbands and which only allows the presumption of paternity to be rebutted by the husband or wife created an irrebuttable presumption infringing on the due process rights of other men who seek to establish paternity. The Court found the statute did not create an irrebuttable presumption but was a substantive rule of law. 491 U.S. at 119-20.

We rejected a similar challenge to a DUI statute in *State v. Larson*, 12 Kan. App. 2d 198, 737 P.2d 880 (1987). There, a defendant argued the Legislature's enactment of K.S.A. 1986 Supp. 8-1567(a)(1), which states that someone who drives with a blood alcohol concentration of 0.08 or more is driving under the influence of alcohol, created an irrebuttable presumption. Larson argued the statute was unconstitutional because he should have been able to present facts to show he could drive safely despite having a blood alcohol concentration of 0.10. 12 Kan. App. 2d at 199-200. But since the statute does not allow a defendant who has driven with a blood alcohol concentration of 0.08 to dispute his ability to drive safely, we found the Legislature created a rule of law, not an irrebuttable presumption. 12 Kan. App. 2d at 200-01. Similarly, since KORA does not allow Rogers to dispute the applicability or necessity of its registration requirements, it establishes a rule of law instead of an irrebuttable presumption.

To support his argument, Rogers also cites *Commonwealth v. Muhammad*, 241 A.3d 1149, 1158 (Pa. Super. 2020), in which Pennsylvania held that mandatory sex offender registration created an unconstitutional irrebuttable presumption in violation of the Pennsylvania Constitution. In that case, the defendant's convictions meant she "was

31

automatically designated a Tier I sexual offender based on her convictions . . . and she will not have any opportunity to challenge this designation or claim that she has been rehabilitated." 241 A.3d at 1158. The Pennsylvania court noted that the Pennsylvania act stated: "'Sexual offenders pose a high risk of committing additional sexual offenses,'" which created a presumption requiring sex offender registration. 241 A.3d at 1155. It then applied a three-part test to determine whether this irrebuttable presumption was unconstitutional, looking at whether: (1) it encroaches on an interest protected by the Due Process Clause; (2) the presumption is not universally true; and (3) reasonable alternative means exist for ascertaining the presumed fact. 241 A.3d at 1155.

Rogers wants us to apply the Pennsylvania irrebuttable presumption test to his case, arguing it would result in a finding that KORA's mandatory registration requirement is unconstitutional as applied to him. But there are some barriers to our adoption of Pennsylvania's test. First, KORA does not contain the same proclamation about recidivism as Pennsylvania's sex offender registration act. K.S.A. 22-4901 et seq. It simply requires individuals who have been convicted of certain crimes to register for certain periods of time. K.S.A. 22-4906. So, as mentioned, it does not create an irrebuttable presumption like the Pennsylvania act does. For this reason alone, Pennsylvania's irrebuttable presumption test is inapplicable to KORA.

Another reason we cannot adopt the Pennsylvania test is because that test implicates both procedural and due process considerations. See *Muhammad*, 241 A.3d at 1158 (finding sex offender registration requirement unconstitutional, in part, because it violates an offender's procedural due process right by not allowing the offender an opportunity to be heard on the risk of recidivism); *Commonwealth v. Torsilieri*, 659 Pa. 359, 382, 232 A.3d 567 (2020) (refusing to pigeonhole whether an analysis of an irrebuttable presumption involves substantive or procedural due process). Yet we are duty-bound by our Supreme Court's determination in *N.R.* that KORA does not violate a

defendant's procedural due process rights. So based on this precedent, we are precluded from applying the Pennsylvania test to address Rogers' due process claim.

*Conclusion*

As the court found in *N.R.*, defendants are subjected to KORA's registration requirements purely based on the crime committed rather than a generalized assumption about the tendencies of those defendants—no factfinding is involved. Thus, KORA does not create an irrebuttable presumption. And the court also found defendants are provided sufficient process in the original adjudication of the crime which subjects to them to KORA. 314 Kan. at 114-15. Based on *N.R.*, we therefore find the aspect of Rogers' sentence mandating sex offender registration for 25 years is not unconstitutional and affirm that part of his sentence.

REMEDY

As noted, we affirm the part of Rogers' sentence which requires him to register as a sex offender for 25 years under KORA, but we vacate his sentence to the extent that it calls for lifetime postrelease supervision. We remand with directions for the district court to resentence Rogers and impose the standard postrelease supervision term for a nondrug severity level 5 offense, which is 24 months. See K.S.A. 22-3717(d)(1)(B). This is the classification of Rogers' crimes and the relief he requested from the district court in his motion to declare lifetime postrelease supervision unconstitutional as applied to him. Since we have vacated part of Rogers' sentence, he must be resentenced for his felony convictions, and he must be present in court for resentencing. See *State v. Turbeville*, 235 Kan. 993, 1003-04, 686 P.2d 138 (1984); K.S.A. 22-3405.

In *State v. Nunez*, 319 Kan. 351, 352, 554 P.3d 656 (2024), the Kansas Supreme Court vacated the portion of Nunez' sentence imposing lifetime postrelease supervision

33

because it found Nunez' rights under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (facts which "'increase[] the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt'"), were violated. The court mandated that Nunez be resentenced to postrelease supervision for 60 months under K.S.A. 22-3717(d)(1)(G)(ii), which sets the prescribed maximum term of postrelease supervision for anyone convicted of the crime Nunez was charged with. 319 Kan. at 357. And in *Proctor I*, we remanded Proctor's case to the "district court so that Proctor may be resentenced to a fixed period of postrelease supervision consistent with Kansas law apart from those statutes pertaining to or requiring lifetime postrelease supervision." 47 Kan. App. 2d at 942.

Similarly, Rogers was charged with committing a nondrug severity level 5 offense, and, according to K.S.A. 22-3717(d)(1)(B), the postrelease supervision term for such an offense is 24 months. We therefore find this term of postrelease supervision to be reasonably proportionate for Rogers' crimes and still in accordance with the statutory scheme fixed by the Legislature.

Affirmed in part, vacated in part, and remanded with directions for resentencing.

* * *

ISHERWOOD, J., concurring: I concur with the majority's decision to remand to the district court but write separately because my assessment of the district court's treatment of the three *Freeman* factors that courts are required to consider when properly examining a disproportional sentence claim, like the one asserted by Tristen Jeffrey Rogers, and what constitutes an appropriate appellate response to the same, stands in sharp contrast to that of the majority. See *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). That is, I have a difference of opinion with respect to why a remand is required in Rogers' case and what should transpire when it returns to the district court.

34

In conducting a *Freeman* analysis, a district court judge is required to make both factual and legal determinations. This in turn requires an appellate court to employ a bifurcated standard of review: "'[*W*]*ithout reweighing the evidence* the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo. [Citations omitted.]' *State v. Woodard*, 294 Kan. 717, 720, 280 P.3d 203 (2012)." (Emphasis added.) *State v. Spear*, 297 Kan. 780, 800, 304 P.3d 1246 (2013). This standard of review provides a framework that is essential to the appellate process because it defines how we, as a reviewing court, evaluate trial court decisions while respecting the appropriate roles of trial and appellate courts in the judicial system. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

It has also been the long-standing position of the Kansas Supreme Court that when an issue arises that requires a *Freeman* analysis, each factor in that test must be considered when the inquiry is conducted. *State v. Riffe*, 308 Kan. 103, 112, 418 P.3d 1278 (2018). The record before us reflects that did not occur in Rogers' case, and the district court seemingly relied solely on the first *Freeman* factor to deny Rogers' claim that the statutorily mandated term of lifetime postrelease supervision for his offense was unconstitutional when applied to him.

I recognize that no objection was made to assert that the district court's incomplete analysis called the adequacy of its conclusion into question. I am also cognizant of the principle that in the absence of an objection reviewing courts typically presume that the district court made the necessary findings to support its conclusion. *State v. Longoria*, 301 Kan. 489, 506, 343 P.3d 1128 (2015). However, in *Riffe*, a case where the district court also relied solely on the first *Freeman* factor and disregarded the other two, our Supreme Court concluded that the presumption model cannot be followed when the appellate record "'does not support such a presumption.'" *Riffe*, 308 Kan. at 111. It determined that in such instances the proper course of action is to remand the case "'for

additional factual findings and legal conclusions.'" 308 Kan. at 111. Accordingly, seeing no compelling distinction between Rogers' and Riffe's cases, I would side with our Supreme Court and reverse the decision of the district court and remand Rogers' case so that the judge can conduct the inquiry as it was intended to be and consider all three *Freeman* factors in its determination of whether lifetime postrelease supervision is unconstitutional under section 9 of the Kansas Constitution Bill of Rights as it applies to Rogers.

The majority's conclusion also results in a remand to the district court but the path it has chosen to get there and the remedy it directs the district court to provide to Rogers runs expressly counter to our standard of review and stands in direct opposition to *Riffe*, 308 Kan. at 111. Both a district court making the initial determination regarding whether a statute is constitutional and an appellate court conducting a review of that determination are required by the separation of powers doctrine to presume the statute is constitutional. *State v. Mossman*, 294 Kan. 901, 906-07, 281 P.3d 153 (2012). It goes hand in hand with that presumption that if there is any reasonable way to construe a statute as constitutional, courts have the duty to do so by resolving all doubts in favor of constitutionality. *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009); see *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008) ("It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution."). The majority seems to have done precisely the opposite here.

The *Freeman* court established a three-part test to aid in the determination of whether a particular term of punishment runs contrary to section 9 of the Kansas Constitution Bill of Rights which prohibits any punishment that "'[is] so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" *State v. Funk*, 301 Kan. 925, 933, 349 P.3d 1230 (2015) (quoting *Freeman*, 223 Kan. at 367). The inquiry requires courts to consider (1)

the nature of the offense and the character of the offender; (2) a comparison of the punishment with punishments imposed in Kansas for more serious offenses; and (3) a comparison of the penalty with punishments in other jurisdictions for the same offense. 223 Kan. at 367. The first factor is "'inherently factual, requiring examination of the facts of the crime and the particular characteristics of the defendant,'" while the second and third factors depend solely on "'legal determinations.'" *State v. Ochs*, 297 Kan. 1094, 1107, 306 P.3d 294 (2013). When conducting this inquiry "*a district court must* make *both* legal and factual determinations." (Emphases added.) *Mossman*, 294 Kan. at 906.

The written motion Rogers drafted that initially brought his claim to the district court's attention comprehensively analyzed the interplay between each of the *Freeman* components and the facts of his case. Then, at the hearing the district court conducted to address the motion, Rogers' counsel delivered oral remarks to supplement his written *Freeman* analysis.

The district court lauded defense counsel for the extensive amount of information, evidence, and expert testimony he provided to buttress his assertions. It nevertheless questioned, on more than one occasion, whether "the lower district court" was the appropriate body to render a decision with respect to Rogers' constitutionality question or whether such issues are better reserved for the appellate courts. The judge ultimately opted to forge ahead.

*There is not substantial competent evidence in the record to support the factors relied on by the district court with respect to the first* Freeman *factor.*

As noted above, the first *Freeman* factor is the factual component of the analytical trinity. It contemplates findings that address "'[t]he nature of the offense and the character of the offender . . . with particular regard to the degree of danger present to society.'" *Mossman*, 294 Kan. at 908 (quoting *Freeman*, 223 Kan. at 367). There are multiple facets

to this inquiry, including: the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment. 223 Kan. at 367.

The majority and I are not wholly at odds with respect to this phase of the district court's analysis. For example, I have no qualms in joining in the majority's conclusion that the record does not contain substantial competent evidence to support several of the points the district court cited as justification under this particular component for its denial of Rogers' motion. Nor do I take issue with the explanation it offers in support of that conclusion. My analysis of the first factor ends there because the firm boundary established by the standard governing our review of this issue does not allow us to proceed further. Again, that standard limits our responsibility to a determination of whether a reasonable person could accept the evidence as sufficient to support the district court's conclusion, not whether our court would have arrived at the same conclusion. *Johnson v. Kansas Dept. of Revenue*, 58 Kan. App. 2d 431, 440, 472 P.3d 92 (2020). We "'must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and *must disregard any conflicting evidence or other inferences that might be drawn from it*.'" (Emphasis added.) *Casper v. Kansas Dept. of Revenue*, 309 Kan. 1211, 1220, 442 P.3d 1038 (2019). In other words, we are not to reweigh the evidence or resolve evidentiary conflicts. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Despite this clear identification of our lane and the corresponding admonition, this is precisely what the majority appears to have done in Rogers' case. Accordingly, I decline to join the majority's efforts to rectify the district court's missteps.

In conducting an overview of the various factors the district court was required to consider, the majority determined that the district court primarily focused on Rogers' recidivism risk but "seemed to ignore the other considerations that must be taken into account when applying the first factor of the *Freeman* test." Slip op. at 13. Then, finding

38

itself persuaded by Rogers' argument on appeal that his case shares similarities with *State v. Proctor*, 47 Kan. App. 2d 889, 898, 280 P.3d 839 (2012) (*Proctor I*), and *State v. Proctor*, No. 104,697, 2013 WL 6726286 (Kan. App. 2013) (unpublished opinion) (*Proctor II*), cases where those "other considerations" also were not considered, the majority independently conducted a comparative analysis and determined that Rogers' case is "nearly identical" to *Proctor I* and *Proctor II*. Because just as in *Proctor II*, "it is hard to reconcile the district court's finding that Rogers presents a danger to society with its finding that his crimes warranted probation rather than incarceration." Slip op. at 14. The majority surmises that the district court did not appear to have conducted a case-specific inquiry when comparing the gravity of Rogers' offense with the severity of his sentence. "And given Rogers' youth, history of childhood abuse, and lack of criminal history, the penological purposes of retribution and deterrence apply to him with much less force." Slip op. at 15. From this mere *list* of factors, not even a detailed analysis of the same, the majority concludes the district court "improperly weighed the first *Freeman* factor and concluded in error that this factor did not weigh heavily in Rogers' favor." Slip op. at 15.

The Kansas Supreme Court has emphasized that when evaluating whether the evidence supports a district court's factual findings, an appellate court "'does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact.'" *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 481, 509 P.3d 1211 (2022). At the most fundamental level, the majority has conducted an independent assessment of factual issues, reweighed the evidence, and resolved conflicts in the evidence—evidence that it fully acknowledges was already seen and heard by the district court. It is simply dismayed those points were not given greater consideration in the district court's analysis of the first *Freeman* factor.

The majority's decision to take up that mantle for the purpose of curing perceived ills in the district court's analysis, to ultimately arrive at a conclusion that is the polar

opposite of that reached by the district court judge directly contravenes the specific and limited role designated to an appellate court. Accordingly, I wholly disagree that the majority's analysis gives rise to a legally permissible foundation upon which to remand Rogers' case with directions for the district court to impose a lesser duration of postrelease supervision than the lifetime term the Legislature determined was appropriate for Rogers' sexually violent crime of conviction.

*The district court's failure to include the second and third* Freeman *factors when analyzing Rogers' proportionality claim requires remand for a full and comprehensive hearing.*

The second prong of the *Freeman* test "steps away from the facts of the crime at issue and compares 'the punishment with punishments imposed in this jurisdiction for more serious offenses.'" *State v. Conrad*, 297 Kan. 76, 78, 298 P.3d 320 (2013). If the review reveals more serious crimes are punished less severely than the offense at issue, "the challenged penalty is to that extent suspect." *Freeman*, 223 Kan. at 367. The district court considers whether the sentence imposed on the defendant is grossly disproportionate in relation to the sentence for the more serious offense, considering the penological purposes of the sentence under review, the seriousness of defendant's crime, and other considerations under the first *Freeman* factor. See *Mossman*, 294 Kan. at 917.

This factor requires a legal determination, unlike the first factor which is inherently factual. *State v. Rogers*, 297 Kan. 83, 88-89, 298 P.3d 325 (2013). Kansas courts have emphasized that while no single factor controls the *Freeman* analysis, consideration must be given to each prong of the test. *State v. Britt*, 295 Kan. 1018, 1032, 287 P.3d 905 (2012).

Despite the longstanding obligation that district courts "must consider all three factors" in the *Freeman* analysis, the judge in Rogers' case arguably did not afford the second factor *any* consideration. The transcript of the hearing reflects that the judge did

not specifically identify the factor, nor did she articulate the obligation placed upon the court for that step of the analysis. Rather, after announcing her conclusion regarding the first *Freeman* factor, the judge made the single isolated italicized statement below that, taken broadly, could be interpreted as a possible reference to the second factor:

"It is a matter of supply and demand for every individual that views, sells, possesses. You are creating greater demand for others to produce and sexually abuse children. In this country and all over the world. There is a larger demand for sex images, a larger demand for victims, along with child trafficking.

"*However, in Kansas possession of child pornography, exploitation of a child, possessing child pornography, is treated in Kansas as a lower severity level offense, frequently resulting in probation.*

"Under the *Freeman* test—I don't believe anybody gave me any information as to how—as to other states and how they treat child pornography possession and whether their—Kansas is disparate." (Emphasis added.)

This single cryptic sentence falls well short of the level of analysis contemplated for the step that requires courts to undertake an intra-jurisdictional comparison and examine Kansas' sentencing scheme to determine whether the challenged sentence is proportional to punishments for more serious crimes within the state. *Conrad*, 297 Kan. at 80. Rather, the only offense referenced by the judge here was "possession of child pornography, exploitation of a child, and possessing child pornography" which are simply linguistic variations for Rogers' crime of conviction, sexual exploitation of a child in violation of K.S.A. 21-5510(a)(2). Additionally, the only punishment referenced by the district court was the assertion that Rogers' crime is a "lower severity level offense, frequently resulting in probation." In actuality, under the Revised Kansas Sentencing Guidelines Act (KSGA), the crime is a severity level 5 person felony and classified as a border box offense, even for those offenders, like Rogers, who have a criminal history score of I. K.S.A. 21-6804(a). The sentence in border box cases is *presumed*

41

*imprisonment*. While a court *may* impose an optional nonprison sentence, it is required to first make certain findings on the record that justify its decision to do so. See K.S.A. 21-6804(f) ("If an offense is classified in grid blocks 5-H, 5-I or 6-G, the court may impose an optional nonprison sentence as provided in subsection [q]."); *State v. Whitlock*, 36 Kan. App. 2d 556, 559, 142 P.3d 334 (2006). That is, before probation can be granted, a district court judge is statutorily required to conduct an assessment, on the record, of the factors outlined under subsection (q). Those factors include: whether an appropriate treatment program exists that will prove more beneficial than incarceration in combating recidivism, that the program is available and the offender could be admitted within a reasonable period of time, and a nonprison sanction would serve community safety interests. K.S.A. 21-6804(q)(1)(A)-(C). Thus, it is unclear what metric the district court relied on to determine that probation is the disposition "frequently" ordered for Rogers' crime of conviction. Additionally, the court made no mention of postrelease supervision at this juncture in the proceedings, which is the *precise* issue that even warranted the extended hearing. It is without question that lifetime postrelease supervision is classified as part of a defendant's total sentence or stated another way, a person serving a postrelease supervision term is still considered to be under a sentence. See *Martin v. Kansas Parole Board*, 292 Kan. 336, 343, 255 P.3d 9 (2011) (postrelease supervision is part of sentence).

The district court similarly failed to conduct any analysis regarding the third *Freeman* factor, how the punishment mandated under Kansas law for Rogers' crime of conviction compares to what is imposed for that offense in other states. The judge explained that the parties did not provide her with any information that detailed how Rogers' offense was treated in other jurisdictions. Rogers did not request clarification, nor did he seek a more comprehensive ruling for his claim.

The Kansas Supreme Court has consistently found that consideration must be given to *each* prong of the *Freeman* test before the issue that triggered its applicability is

considered resolved. *Riffe*, 308 Kan. at 109; *Ochs*, 297 Kan. at 1107; *State v. Boleyn*, 297 Kan. 610, 629-30, 303 P.3d 680 (2013); *Rogers*, 297 Kan. at 88; *Britt*, 295 Kan. at 1032; *Woodard*, 294 Kan. at 723; *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008).

The majority likewise recognizes the district court's failure to consider factors two and three of the *Freeman* inquiry but takes the position that the Supreme Court's opinions in *Mossman* and *State v. Cameron*, 294 Kan. 884, 281 P.3d 143 (2012), stand for the proposition that points established under one factor may fluidly pass to another that otherwise suffers from a sparse or nonexistent analysis. We are again at odds with respect to the ramifications that result from the manner in which the district court approached the *Freeman* issue.

In both *Mossman* and *Cameron*, the Supreme Court declined to find that the first *Freeman* factor weighed in either offender's favor. *Mossman*, 294 Kan. at 912; *Cameron*, 294 Kan. at 892. Both courts also reached similar conclusions with respect to the second *Freeman* factor, that the differences in proportionality between their respective sentences and one for second-degree murder "is not so significant that the second *Freeman* factor outweighs the first *Freeman* factor." *Mossman*, 294 Kan. at 917; *Cameron*, 294 Kan. at 893. The *Mossman* court clarified that

> "Mossman's sentence to lifetime postrelease supervision is not grossly disproportionate in relation to the sentence applicable to second-degree murder in Kansas when we consider the penological purposes, the seriousness of the crime, and the other concerns discussed in relation to the first *Freeman* factor." 294 Kan. at 917.

The majority interprets the *Mossman* and *Cameron* holdings to mean that because those courts acknowledged "the defendants made a 'valid point' that they would be subject to lifetime restrictions on their freedom and would be constrained for longer than

if they had committed second-degree murder," then "the momentum of the first *Freeman* factor against the defendants [necessarily] carried over into how the court[s] weighed the second *Freeman* factor." Slip op. at 16. From this the majority extrapolates that "both the length and method of punishment are relevant to the second *Freeman* factor" and where the *Mossman* and *Cameron* courts transferred criteria over from the first factor when evaluating the second "we see no reason why circumstances weighing in [Rogers'] favor" on the first factor "should not similarly be considered" when analyzing the second factor. Slip op. at 17.

First, the Kansas Supreme Court has stated that the *Freeman* test will not apply "'where the *method* of punishment, rather than the length of a sentence, is challenged as cruel or unusual.'" (Emphasis added.) *Mossman*, 294 Kan. at 909; *State v. Kleypas*, 272 Kan. 894, 1032-33, 40 P.3d 139 (2001) (quoting *State v. Scott*, 265 Kan. 1, 9, 961 P.2d 667 [1998]), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

Secondarily, I believe the majority's interpretation of *Mossman* and *Cameron* stretches those authorities beyond their intended holdings. Giving the plain language of their respective *Freeman* analyses a straightforward interpretation, in my view the Supreme Court simply communicated that both offenders accurately noted that the lifetime postrelease terms they will serve upon their release from prison translates to an overall longer term in custody than one convicted of second-degree murder. Nevertheless, that disparity is not a significant enough factor to override the components that shape the first *Freeman* factor, i.e., the seriousness of the crime that resulted in their sentence for lifetime postrelease supervision and the penological purposes specific to sexually violent offenses that justify that level of supervision. *Mossman*, 294 Kan. at 917; *Cameron*, 294 Kan. at 893.

The majority has essentially concluded that when an appellate court makes factual determinations that are favorable to a defendant under the first *Freeman* factor, the appellate court is then free to supplant those same favorable determinations under the second *Freeman* factor as needed to cure deficiencies or fill analytical gaps borne of that same district court's failure to conduct the proper legal analysis required by the second factor. This marks a significant departure from the longstanding approach taken by Kansas courts in holding that all three *Freeman* factors must be considered when analyzing whether a sentence violates the state constitutional prohibition against cruel or unusual punishment under section 9 of the Kansas Constitution Bill of Rights. *Britt*, 295 Kan. at 1032; *Woodard*, 294 Kan. at 723; *Ortega-Cadelan*, 287 Kan. at 161. There is no indication from these cases that an appellate court may borrow from Peter to pay Paul when a district court fails to honor its obligation to fulfill all three steps of the *Freeman* inquiry.

An additional point of consideration is what impact such an analytical change would have on the practice of consistency in sentencing that prompted the adoption of the KSGA. *State v. Montgomery*, 314 Kan. 33, 38, 494 P.3d 147 (2021) (a legislative purpose underlying the KSGA is to standardize sentences so similarly situated offenders are treated the same). To truly achieve the goal of consistency in sentencing, the theory must be extended to also require the uniform application of tests and analyses so that offenders are not treated differently based on procedural variations. I fear the modification to the *Freeman* analysis that the majority implicitly advocates for, through its analyses of *Mossman* and *Cameron*, carries the potential to create a fertile ground for disparity.

In my opinion we cannot delve into the merits of Rogers' claim that lifetime postrelease supervision is unconstitutional as applied to him until we first ascertain how the *Freeman* test impacts his case, if at all, because a district court has yet to apply the analysis to the facts of his case.

45

As stated previously, I recognize that a party generally bears the responsibility to object to inadequate findings of fact and conclusions of law so that the district court has a reasonable opportunity to correct any alleged deficiencies and to ensure that the issue is properly preserved for appeal. *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013); *State ex rel. Kansas Highway Patrol v. $28,350 in U.S. Currency*, 65 Kan. App. 2d 203, 216, 562 P.3d 1034 (2025). And that when, as here, no objection is made to a district court's findings of fact or conclusions of law on the basis of inadequacy, an appellate court can presume the district court found all facts necessary to support its judgment. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 510, 509 P.3d 1211 (2022). But, again, that course of action is not appropriate "[w]hen the record on appeal does not support such a presumption." *Progressive Products, Inc. v. Swartz*, 292 Kan. 947, 961-62, 258 P.3d 969 (2011). Rather, when those circumstances arise, we must remand the case with directions to make additional factual findings and legal conclusions. *State v. Rodriguez*, 302 Kan. 85, 91, 350 P.3d 1083 (2015); *Progressive Products*, 292 Kan. at 961-62. Accordingly, I believe the proper course of action is to model the outcome the Kansas Supreme Court deemed appropriate in *Riffe*, a case that is strikingly similar to Rogers'.

Johnathan Riffe, like Rogers, moved the district court to find that a term of lifetime postrelease supervision was unconstitutional as applied to him. *Riffe*, 308 Kan. at 104. Despite acknowledging that the issue triggered an analysis under *Freeman*, the district court concluded that the first of the three factors favored Riffe while the remaining two did not apply to his case. Based on this conclusion, it ruled favorably for Riffe and imposed a significantly reduced term of postrelease supervision. 308 Kan. at 104, 106, 109.

The State appealed and a panel of this court interpreted the district court's finding that the two factors at issue did not "apply," to simply mean those components favored the State. *State v. Riffe*, No. 113,746, 2016 WL 937869, at *10-11 (Kan. App. 2016)

(unpublished opinion). The panel ultimately concluded that all three *Freeman* factors favored the State then reversed and remanded the case with directions to impose lifetime postrelease supervision. 2016 WL 937869, at *13, 16.

The Kansas Supreme Court granted Riffe's request for review, and it ultimately determined that the Court of Appeals' decision must be reversed. As support for its conclusion, the court explained that the district court erred when it chose to disregard *Freeman*'s second and third factors rather than conduct a comprehensive analysis. According to the court, the nature of this error should have prompted the Court of Appeals to remand the case with directions to conduct a proper *Freeman* analysis "rather than [use] its own judgment to fill in the holes created by a deficient trial court record." *Riffe*, 308 Kan. at 110.

The *Riffe* court acknowledged the general presumption that a district court made the requisite findings to support its conclusion when an objection calling the adequacy of those findings into question has not been voiced. But the Supreme Court made clear it is equally true that the presumption cannot be followed when the record on appeal fails to support the conclusion that such findings were made. *Riffe*, 308 Kan. at 111. It went on to find that the appellate record in Riffe's case justified a deviation from the presumption. Specifically, it did not support a conclusion that the district court simply found that the factors favored the State, as this court surmised. 308 Kan. at 112. Rather, it revealed that the district court "purposefully disregarded" the second and third *Freeman* factors. 308 Kan. at 112. It also failed to bear out that the district court made the necessary findings to substantiate its conclusion that lifetime postrelease supervision was unconstitutional as applied to Riffe. 308 Kan. at 111. Given that a court is required to consider all three *Freeman* factors when conducting its analysis, the district court's failure to do so in Riffe's case amounted to legal error. Thus, the appropriate remedy was to remand the case to enable the district court to employ the proper legal standard when considering whether lifetime postrelease supervision is unconstitutional under section 9 of the Kansas

47

Constitution Bill of Rights as it applied to Riffe, then make new and complete factual findings that are consistent with the guidance provided in *Freeman*. *Riffe*, 308 Kan. at 112.

I see no justification in treating Rogers' case any differently. I recognize there is a distinct possibility the outcome will be the same. Nevertheless, I believe Rogers is entitled to receive, and the district court is required to conduct, the type of hearing that the law has long held is required, one where all three *Freeman* factors are considered by the district court when analyzing a disproportionality claim. The failure to follow the *Riffe* court's course of action arguably amounts to "using [our] own judgment to fill in the holes created by a deficient trial court record" as was deemed problematic and impermissible in *Riffe*. 308 Kan. at 110

Accordingly, I would remand with directions for the district court to review the record "or conduct a new evidentiary hearing, at its discretion, to make new and complete factual findings that are consistent with the guidance provided in *Freeman*." *Riffe*, 308 Kan. at 112. That is, fully and explicitly consider all three factors in its analysis.